Wilbur L. GINTHER et al., Appellants,

v.

Henry J. N. TAUB et al., Appellees.

No. 5829.

Court of Civil Appeals of Texas, Waco.

Aug. 24, 1978.

Rehearing Denied Sept. 21, 1978.

Thomas M. Phillips and Thomas R. Phillips, Baker & Botts, Houston, Lawrence A. Mann, Mann, Cronfel, Dickinson & Saldana, Nat B. King, Laredo, for appellants.

George P. Kazen, Mann, Castillon, Freed & Kazen, Laredo, Sam W. Levy, Levy & Levy, Joyce Cox, Cox, Pakenham & Roady, Houston, Julio A. Garcia, Garcia, Morales & Gonzalez, Laredo, for appellees.

HALL, Justice.

The plaintiffs in this case appeal from a take-nothing summary judgment. We reverse the judgment.

Plaintiffs-appellants Wilbur L. Ginther and Howard C. Warren brought this suit against defendants-appellees Henry J. N. Taub and William A. MacNaughton to establish and recover equitable title to two-thirds, or, alternatively, one-half of Taub's record interest in a 2716.46-acres oil, gas, and mineral lease in Webb County, Texas, known as the "Alexander lease," which Taub acquired by assignment from Ginther and Warren; and to secure an accounting and the return of certain other oil and gas properties from MacNaughton under a disputed agreement for payment of legal fees to MacNaughton, an attorney at law, by Ginther and Warren. Appellant George M. Clement is an intervenor in the suit seeking recognition of a 1/64th overriding royalty interest in the Alexander lease allegedly assigned to him by Ginther and Warren from their interest.

Ginther and Warren were once the record owners of all the lease. They base their lawsuit against Taub on allegations that their conveyances to him of the interests they now seek to recover were induced by breach of fiduciary relationships, fraud, conspiracy, and undue influence on the part of both Taub and MacNaughton, resulting in Taub's unjust enrichment at their expense. Alternatively, they pleaded for *quantum meruit* for the reasonable value of their efforts in developing the lease. They also seek other relief by way of money damages which we need not detail.

It will be developed later in this opinion that during the time critical to this lawsuit Ginther and Warren were petitioners in the Bankruptcy Court for the Southern District of Texas for an arrangement for payment of their creditors commonly known as a "Chapter XI" Plan of Arrangement. MacNaughton was their lawyer in that proceeding. His fee was $66,225.00 plus some out-of-pocket expenses. Ginther and Warren base their suit against MacNaughton for an accounting and for the return of certain oil

and gas properties assigned to him by them on allegations that they paid him $10,000.00 cash and assigned him the oil and gas properties subject to the condition that he would reassign the properties when he recovered the balance of his fee from income produced therefrom; that he thereafter complied with the agreement for two years by sending them accountings of income received by him on the properties; but that he now claims the assignments were absolute.

Taub answered with a general denial, and with pleadings that the recoveries of title to the lease sought by Ginther and Warren were prohibited by the Texas Trust Act, Art. 7425b–7, Vernon's Tex.Civ.St.; the Statute of Frauds, V.T.C.A., Bus. & Comm. § 26.01; and the Statute of Conveyances, Art. 1288, Vernon's Tex.Civ.St. He also alleged in detail that, without knowledge on his part, the conveyance of record title of the lease to him was made by Ginther and Warren to defraud their creditors in their bankruptcy proceeding and that for this reason they were not entitled to equitable relief. Additionally, he alleged that by reason of the provisions of the Texas Real Estate License Act, Article 6573a, Secs. 19 and 28, Vernon's Tex.Civ.St., and the Texas Securities Act, Article 581–34, Vernon's Tex.Civ.St., Ginther and Warren could not recover on their claim for *quantum meruit*.

MacNaughton answered with a general denial, and with pleadings that the conveyances to him for his fee were absolute in their terms and were not made under the condition alleged by Ginther and Warren; that the validity and finality of the assignments for payment of his fee were tried and determined in the Bankruptcy Court and decided by that Court's order approving the assignments; and that the order of the Bankruptcy Court is conclusive and is not subject to collateral attack by Ginther and Warren. He also alleged that the asserted agreement on his part is unenforcible by reason of the Statute of Frauds.

Taub and MacNaughton separately filed motions for summary judgment. After a hearing, the motions were granted and judgment was rendered on May 4, 1977,

that Ginther and Warren and Clement take nothing. They appeal asserting material fact questions exist in the record on the causes of action against both Taub and MacNaughton preventing disposition by summary judgment. We agree and reverse the judgment and remand the case for trial.

■ It is settled that on review of a summary judgment all conflicts in the evidence are disregarded, the proof which tends to support the position of the party opposing the motion is accepted as true, and all doubts as to the existence of a genuine issue of material fact are resolved against the movant. *Farley v. Prudential Insurance Company*, 480 S.W.2d 176; 178 (Tex. Sup.1972). The following summary is made under those rules.

Ginther and Warren are independent oil men who have worked together since 1934 in the discovery and production of oil and gas properties. During the 1950's and 1960's they were quite successful and were well known and respected in the oil and gas industry and in social circles in Houston, Texas, where they office. Clement, a former geologist with a major oil company, has been associated with Ginther and Warren since 1956. For many years they have been active in the development of oil and gas properties in Webb County, Texas. Among their acquisitions in Webb County was the previously mentioned 2716.46-acres oil, gas and mineral lease known as the "Alexander lease" which Ginther and Warren purchased on February 17, 1969. The lease required annual delay rentals of $1.00 per acre, and provided that it would terminate on February 17, 1974, in the absence of paying production, unless on or before that day the lessees paid the lessors the sum of $13,-500.00 as bonus (in lieu of the sixth year's delay rental of $1.00 per acre), for an extension for five additional years. The lease also called for a cash payment of $6,500.00 to the lessors upon execution, which was paid by Ginther and Warren. They also paid James A. Mayo, the broker through whom they obtained the lease, $1,358.00 cash and assigned him a ⅟32nd overriding royalty interest for his services. The "Mayo override" is not in dispute in this case.

Because of confidential geological data they had and other information on Webb County oil properties known by them, Ginther and Warren were very optimistic about the future production capabilities of the Alexander lease. They did not have sufficient funds for drilling; and upon acquiring the lease, they began searching for a partner to whom they could "farm-out" an interest in it in exchange for production. They labored toward that end until March, 1974, when through their efforts a farm-out agreement on the lease was concluded with Good Hope Refineries, Inc.

Although unable to develop the lease immediately after its acquisition, Ginther and Warren kept it alive by paying the annual delay rentals of $2,716.46 in 1970 and 1971. By 1972, however, their financial position had severely deteriorated. For this reason and because they thought highly of the Alexander lease, they determined to take in a partner to help defray the cost of maintaining the lease. Accordingly, they offered appellee Taub who was their close friend and long-time business associate a one-third undivided interest in the lease for the price of the annual delay rental due February 17, 1972. After Ginther and Warren provided Taub with their confidential geological information Taub accepted their offer, paid the delay rental, and was assigned a one-third interest in the lease subject only to the Mayo override. This one-third interest assignment to Taub in 1972 is not in dispute in this lawsuit.

Ginther's and Warren's financial condition continued to worsen. They sought the assistance of and subsequently retained appellee MacNaughton who was knowledgeable as an attorney in both bankruptcy and oil and gas matters. He recommended in a letter to them that they petition for a Chapter XI Bankruptcy proceeding "by which you go into the bankruptcy court, acknowledge that you are not able from your assets in their present condition to pay your creditors in full. You remain in title, possession and control of your properties but liquidate,

modify and adjust same under the supervision and orders of the bankruptcy court and ultimately come forward with a program called a plan of arrangement by which you distribute your named and designated assets to your creditors in full satisfaction of the debt owed to them. If the creditors are satisfied that you are not hiding anything or committing any other act in violation of their confidence and faith, having placed in full view to them your assets and your liabilities, they will normally accept the plan . . . . Upon such an acceptance, the plan is effectuated, your designated assets are distributed to your creditors in full satisfaction of your debts to them, the case is closed and you go on and continue in business thereafter just as you had before you filed the proceedings. You are not a bankrupt, you have not gone through bankruptcy, you remain in title, possession and control of your affairs until you carry out your plan and it presupposes that you are simply having an interim period of bad financial times and it gives a certain protection and court control to you while you so straighten out your affairs."

Ginther and Warren followed MacNaughton's advice and, on October 31, 1972, petitioned for a Chapter XI Arrangement in the Bankruptcy Court for the Southern District of Texas. Each attached a schedule of assets to his petition, listing the Alexander lease first among his non-producing assets in Webb County.

### The Taub-Ginther-Warren Relationship

Taub is a wealthy Houston businessman whose activities include dealings in oil and gas properties. Ginther and Warren became acquainted with Taub in the mid-1950's when they were at the peak of their prosperity. A close friendship developed. Taub and Ginther became especially close. Taub testified that Ginther was like his brother; and Ginther stated that Taub was his best friend, and like a member of the family. The record evidences those relationships.

Following the establishment of their close social relationship, Taub began to participate with Ginther and Warren in certain oil and gas ventures. Over the years, they invested together in forty to fifty separate transactions. Almost all commitments between them were made orally, and then reduced to writing at a later date. Taub always kept his word with Ginther and Warren and never abused the confidence they reposed in him, and they regarded him as one of their best partners. Their relationship was so close that Ginther and Warren trusted Taub "as much as anybody could."

Although their percentage of successful ventures was above average for the industry, Taub and Ginther and Warren suffered large losses together on several occasions. One especially costly venture was the North Milton deal in Harris County, which Taub had in fact brought to the parties' attention. This particular loss was one reason why Ginther and Warren gave Taub "first chance" on the Alexander lease, because they believed that "whoever came in with us had a good chance to do some real good here."

### The MacNaughton-Ginther-Warren Relationship

It is undisputed that MacNaughton was Ginther's and Warren's attorney throughout the period material to this lawsuit. There is evidence supporting the conclusion that in the course of the bankruptcy proceeding he gained complete control of the business affairs of Ginther and Warren. In the beginning, he told them they were no longer "masters of their destiny" and that their destiny "would be in his hands and the hands of the court"; and that they "must follow his instructions to the letter."

Ginther and Warren became "debtors in possession of assets" in the bankruptcy suit, but MacNaughton assumed final authority over their properties, income and expenditures. He told them so in a letter in November, 1972, stating, "I will shepherd the receipt and disbursement of monies and the preservation and transformation of assets." Ginther and Warren dutifully complied with every instruction MacNaughton gave

during the Chapter XI Proceeding. They were totally inexperienced with bankruptcy proceedings and placed absolute trust in their attorney. They never questioned MacNaughton regarding any of the legal documents related to the proceeding; and they did not bother even to read many of the instruments, some very lengthy, he presented to them for their signatures.

It is undisputed that during MacNaughton's control and "shepherding" of Ginther and Warren and their assets, their record interest in the Alexander lease was reduced in 1973 from two-thirds to one-half and then to nothing, while Taub's recorded ownership in the lease was correspondingly increased from one-third to one-half and then to 100%; and that during the same period, the Alexander lease was deleted from the list of Ginther's and Warren's assets in instruments prepared by MacNaughton and filed by him in the Bankruptcy Court.

### The Taub-MacNaughton Relationship

MacNaughton had performed legal services for Taub since 1957, and Taub was one of his most prestigious and valued clients. The record shows that between December, 1969, and July, 1974, MacNaughton billed Taub 136 times for various legal services, and sent Taub twenty other "no charge" statements for services. Additionally, in February, 1972, they formed a limited partnership, with MacNaughton the general partner and Taub the limited partner, for the purpose of erecting a six-stories office building on land in Houston owned by MacNaughton. The venture ran into difficulties because of inflation, labor problems, and material shortages. MacNaughton, whose personal finances were admittedly limited, was required to seek additional funding beyond the $3,000,000.00 originally contemplated. Taub provided this funding by personally guaranteeing several promissory notes made intermittently by the partnership in 1972 and 1973 which totaled more than $300,000.00. In October, 1973, based in part upon the guarantees, Taub's ownership of the partnership was increased from 60% to 75%; the land was transferred from

the partnership to an alter-ego corporation named "MacNaughton Lands, Inc."; and all shares of stock of the corporation were assigned to Taub. Ginther and Warren assert that those facts reasonably support the inference that "Taub was left in a position to wipe out MacNaughton's equity in the venture at will," and we agree.

### The March 6th Assignment

MacNaughton erroneously told Ginther and Warren they could not use funds from their debtor-in-possession accounts to pay delay rentals to keep their non-producing leases in force. In truth, they were permitted to do so by order of the Bankruptcy Court which specifically authorized them "to pay and satisfy out of any funds now or hereafter coming into [their] possession all normal and usual costs of operating and maintaining [their] office as oil and gas operator[s], including the payment of delay rentals . . ." They were left ignorant of that order. Believing they were without funds usable for payment of delay rentals, they sought help. In a telephone conversation between Ginther and Taub in January, 1973, Taub had said, "By the way, Wilbur, I'm sorry to hear about your plight under Chapter XI, and I want you to know if I can do anything for you, money or anything, just call on me." Later, acting in reliance on Taub's past friendship and his recent offer of aid and his interest in the Alexander lease, Ginther, while out of town, asked Warren to contact Taub and arrange for Taub to make the entire delay rental payment due on the Alexander lease in February, 1973. Warren was unable to reach Taub directly, but he did talk twice to Taub's secretary, Betty Wynn. Through her, Warren secured Taub's promise to pay the $2,717.00 rental which included his and Ginther's $1,800.00 share. Warren suggested to Mrs. Wynn that a repayment formula similar to the one they had used with the Exxon Company might be employed for repaying Taub. Under the "Exxon formula," with which all parties were familiar, Exxon paid the entire delay rental and received an assignment of the lease from Ginther and Warren. They reserved an

override in the lease and retained the right under a letter agreement to reacquire their entire original interest by paying Exxon their share of the rental within six months. Warren's mention of the Exxon formula to Mrs. Wynn was "just a suggestion, not an offer," and no agreement was actually reached concerning Ginther's and Warren's obligation to Taub for the payment. Because of their long-standing friendship with Taub and his offer of financial aid, Ginther assumed Taub's payment for them was in the nature of a loan.

Taub decided to make the payment for Ginther and Warren only after consulting with MacNaughton. Without contacting Ginther or Warren, Taub called MacNaughton a second time and instructed him to prepare documents reflecting his agreement with Ginther and Warren concerning the delay rental payment. On the basis of this conversation, MacNaughton prepared an assignment (the "March 6th Assignment") by which Ginther and Warren would transfer an additional one-sixth interest in the lease to Taub as consideration for his payment of the rental. The instrument provided that Ginther and Warren assigned to Taub:

> "[A] total undivided sixteen and two-thirds (16⅔%) percent leasehold working interest in and to [the Alexander lease], all to the end that upon execution and delivery of this instrument, said Oil, Gas and Mining Lease shall be owned [subject to the Mayo override] by the following named parties in the following proportions, to-wit:

| "W.L. Ginther | 25% |
| Howard C. Warren | 25% |
| Henry J. N. Taub | 50%." |

The instrument provided blank space for execution on "this _____ day of March, 1973"; but recited that it was "effective at 7:00 A.M. on February 1, 1973." It did not contain any provision for repayment like the Exxon formula, and no written side agreements were made concerning repayment.

MacNaughton also prepared for Ginther's and Warren's signatures an application to the Bankruptcy Court for authority to execute the March 6th Assignment. The application recited that Ginther and Warren made the agreement with Taub because they "did not believe that they had sufficient cash funds necessary to bear and pay their proportionate part of the cash cost of said [delay rental] payments." The Bankruptcy Court records show, however, that they in fact had $12,660.43 in their accounts on February 1, 1973, and $13,680.24 in the accounts on February 28, 1973, after adjustments for the month's income deposits and cash disbursements. If Ginther's and Warren's part of the 1973 delay rental had been paid from those funds this lawsuit could never have arisen.

Although MacNaughton was representing Ginther and Warren and Taub in preparation of documentation of their agreement for payment of the delay rental, he talked only with Taub to determine what if anything the parties had agreed; and he never consulted with Ginther and Warren prior to presenting them with the March 6th Assignment. It came as a surprise to them, and they were unhappy with it. However, their complaints to MacNaughton were ineffective. He told them, "This is the way I've worked out the deal with Henry [Taub] on the Alexander. You give up sixteen and two-thirds percent, Mr. Taub puts up $1,800.00 for your rental. And that's the deal. This is the way I've got this thing worked out." Ginther and Warren had recently gained additional information which bolstered their confidence in the Alexander lease, and they were anxious to maintain the lease. Ginther explained their choice in these words: "I trusted Mr. MacNaughton and Mr. Taub was an old friend of ours and we couldn't pay the rental with our funds." Accordingly, they followed MacNaughton's advice and executed the assignment and the accompanying application on March 6th.

MacNaughton also prepared an order confirming the March 6th Assignment, which was signed by the judge of the Bankruptcy Court on March 6th. MacNaughton testified that this order would give Ginther and Warren "assurance" in their bankruptcy

proceeding that they had acted properly in executing the assignment. The order has never been set aside or superseded in the Bankruptcy Court, and no action to modify it has ever been attempted.

Immediately after execution of the March 6th Assignment, on the same day, MacNaughton sent the assignment to Webb County to be recorded. A copy of the transmittal letter was sent to Taub, and Taub made certain reminder notes on the letter copy concerning the payment of the 1974 rental and the obtaining of recording information. On March 19th, MacNaughton forwarded the original March 6th Assignment, now recorded, to Taub, and Taub again made certain notes to himself on MacNaughton's transmittal letter. None of Taub's notes on either letter indicated that the March 6th Assignment was in any way erroneous.

Whether or not Taub believed the March 6th Assignment represented the agreement of the parties when it was executed, he and MacNaughton considered MacNaughton's legal services relating to the assignment rendered for Taub. On April 4, 1973, MacNaughton sent Taub a "no charge" statement for the preparation and recordation of the assignment. Taub wrote, "Thanks, Bill. H." on the statement and returned it to MacNaughton.

### The December 4th Assignment

Until August 13, 1973, Ginther and Warren did not know that anyone questioned the legal effect of the March 6th Assignment. Until then, neither MacNaughton nor Taub had ever suggested to Ginther or Warren that there was any problem concerning the ownership of the Alexander lease, although all had seen each other in cordial fashion throughout the Spring and Summer of 1973. Meanwhile, MacNaughton prepared a preliminary Plan of Arrangement with the creditors, and then a Final Plan. The Plans gave the creditors a $\frac{1}{64}$th overriding interest in listed non-producing oil and gas properties owned by Ginther and Warren in Webb County. Without Ginther's and Warren's knowledge,

both Plans excluded the Alexander lease, although MacNaughton had previously represented to the creditors that all non-producing Webb County leases would be included in the Plan. MacNaughton would later explain his exclusion of the Alexander lease in these words: "[T]he matter was beginning to be confused and I simply deleted that lease from the Plan so that the creditors did not participate in any override therein." The record shows that he and the other parties knew by mid-1973 that the lease was rapidly increasing in value.

The preliminary Plan of Arrangement was sent to the creditors on July 12, 1973. On July 27th, MacNaughton filed the Final Plan with the Bankruptcy Court. Without Ginther's or Warren's knowledge or permission, MacNaughton also sent Taub copies of both Plans. Taub placed them in his personal file concerning the Alexander lease.

On August 3rd, the Bankruptcy Court mailed the Final Plan to the creditors. Confirmation by the creditors was set for hearing on August 21st.

Also on August 3rd, MacNaughton wrote a secret letter to Taub, with no copies to Ginther and Warren, stating in part:

"You will recall that on Feb. 15, 1972 you paid $2717.46 for [a $\frac{1}{8}$ interest in the Alexander lease] and which payment I am sure was used by Ginther-Warren for the delay rental due on or about that date in 1972. Then, on February 17, 1973 another delay rental payment was due in the same sum.

"It is at this point that in my communication with Betty Wynn, you and Ginther-Warren, I became confused. There was an assignment executed by Ginther-Warren to you of a 16⅔ interest in this lease pursuant to a March 6, 1973 Order of the Referee, a copy of each of which I attach for your ease of reference. However, instead of the end result of that transaction being full ownership in you to the entire lease (a 66⅔% assignment instead of 16⅔% as I actually prepared it) with either an overriding royalty or re-acquiring right vested in Ginther-Warren, I drew the papers based upon such misun-

derstanding on my part so that Ginther and Warren each still own of record this date a 25% interest each in said lease. I take full responsibility for this 'foul-up' because I do not think it reflects the intent of the parties nor is it in keeping with representations heretofore made to the creditors of Ginther-Warren in the Chapter XI proceedings. I do believe that it is imperative that this question be resolved by appropriate documentation prior to the date of the resumed First Meeting of Creditors and for confirmation, which for your information is 2 o'clock P.M., August 21, 1973.

"Please keep me advised."

On August 13th, Ginther and Warren went to MacNaughton's office at his request to sign some papers relating to the bankruptcy proceeding. They officed across the street from MacNaughton, and in his words, there was "constant communication back and forth, by telephone or otherwise . . . They would pop into my office with no particular—sometimes with appointments and sometimes not." In all his visits to MacNaughton's office prior to August 13th, Ginther had never seen Taub there, but Taub and his son, H. Ben Taub, were there when Ginther and Warren arrived on that day. On that occasion, while MacNaughton remained silent, Taub asserted to Ginther and Warren that in exchange for his payment of the delay rental they had agreed to assign him all their interest in the Alexander lease under the Exxon formula, that through MacNaughton's mistake the March 6th Assignment erroneously conveyed him only 16⅔ of their interest rather than all (66⅔ interest), that they had failed to repay him within six months, and that he was therefore sole owner of the Alexander lease. He called upon them to effect a corrected conveyance. They denied that they had agreed to convey their entire interest, and the dispute continued for several months thereafter. During that time Taub twice acknowledged that they still owned one-half of the lease. Nevertheless, Ginther and Warren eventually executed and delivered to Taub on January 9, 1974, an assignment dated December 4, 1973, (the "December 4th Assignment") which provided in part as follows:

". . . . .

"WHEREAS, by instrument dated on or about March 6, 1973, there was transferred and assigned to HENRY J. N. TAUB an additional 16⅔% interest in the above referred to [Alexander] lease but which assignment, except for a scrivener's error, should have been for an undivided 66⅔% interest therein; . . . and the parties do here desire to rectify and remedy said scrivener's error to the end that all of the leasehold interest shall be vested in HENRY J. N. TAUB as originally intended;

"NOW, THEREFORE, . . . we, W. L. Ginther and Howard C. Warren . . do hereby . . . ASSIGN and CONVEY unto the said HENRY J. N. TAUB, his heirs and assigns, hereinafter called the Assignee, all of that certain undivided one-half interest in and to the above referred to Oil, Gas and Mineral Lease . . to the end that with the undivided one-third interest conveyed to Assignee by instrument of February 15, 1972, that with the 16⅔% interest conveyed to Assignee by the instrument of March 6 1973, and with the undivided one-half interest here conveyed to Assignee, Assignee shall be the owner of the entire leasehold estate in said Oil, Gas and Mineral Lease; but expressly subject to [the Mayo override]."

There is evidence we have not set forth which shows that Ginther and Warren were induced to execute the December 4th Assignment by MacNaughton's promise and assurance of benefits to them from Taub if they did, and his statements concerning certain detriments to them if they did not. There is also evidence that after the assignment Ginther and Warren continued to develop the lease believing they were co-owners with Taub; and that in 1974, through their efforts, the farm-out agreement was arranged with Good Hope Refineries for drilling the lease, which Taub executed. There is additional evidence that the Alexander lease has become very valuable, and

that by the time of judgment in this case Taub had received more than $300,000.00 income from it.

### Our Holdings

■ As we have stated, Ginther and Warren seek relief from the summary judgment on grounds that the March 6th Assignment and the December 4th Assignment were procured from them by conspiracy, fraud, undue influence, and breach of fiduciary relationship by Taub acting individually and with and through MacNaughton, resulting in Taub's unjust enrichment. Traditionally, the courts of our State have recognized and enforced constructive trusts in those circumstances. E. g. *Ward v. Scarborough,* 236 S.W. 434 (Tex.Com.App.1922, jdgmt adopted), conspiracy; *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256 (1951), breach of fiduciary duty; *Meadows v. Bierschwale,* 516 S.W.2d 125 (Tex.Sup.1974), fraud; and *Andrews v. Brown,* 10 S.W.2d 707 (Tex.Com.App.1928), undue influence. The Texas Trust Act, the Statute of Frauds, and the Statute of Conveyances, pleaded by Taub, do not prohibit the imposition of constructive trusts under those facts. The Texas Trust Act expressly excludes constructive trusts from its provisions. Article 7425b–2, Vernon's Tex. Civ.St. The Statute of Frauds and the Statute of Conveyances require that certain agreements concerning the transfer of real estate be in writing to be enforceable. But Ginther and Warren are not suing to enforce an oral agreement, and the Statutes are not applicable.

■ The record in this case is voluminous, containing the statement of facts of a lengthy prior trial before a jury, many depositions, and multitudinous exhibits. The facts are involved and greatly detailed. Our recitation of the evidence relating to every issue between the parties would render this opinion unbearably long, and we shall not do so. It is sufficient to say that our review of the record convinces us that there is evidence supporting every theory upon which Ginther and Warren seek to avoid the two assignments to Taub. In

fairness to Taub, and to MacNaughton, it should also be stated that there is proof in the record refuting those theories. But that proof only raised questions of fact on the issues, and did not entitle Taub to summary judgment.

■ Particularly, the small amount of the evidence we have recited establishes that the relationship between Taub and Ginther and Warren was that of fiduciaries when the March 6th Assignment and the December 4th Assignment were executed. A fiduciary relationship can arise from a technical business association between persons or "informally from purely personal relationships," where trust and confidence have been reposed by the parties by reason of the relationship. *MacDonald v. Follett,* 142 Tex. 616, 180 S.W.2d 334, 337 (1944); *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex. Sup.1963); *Gaines v. Hamman,* 163 Tex. 618, 358 S.W.2d 557, 560 (1962); *Holland v. Lesesne,* 350 S.W.2d 859, 861–62 (Tex.Civ. App.—San Antonio 1961, writ ref'd n. r. e.). Our record shows both the technical and the informal relationships of trust between Taub and Ginther and Warren.

■ Under disputed proof, whether the parties' relationship is actually a fiduciary relationship is a question of fact. *Schiller v. Elick,* 150 Tex. 363, 240 S.W.2d 997, 999 (1951).

■ Where the plaintiff establishes that the transaction which he seeks to avoid was executed when a fiduciary relationship existed between him and the defendant, equity indulges the presumption of unfairness and invalidity, and casts upon the defendant claiming validity and benefits of the transaction the burden of proving that it is fair, honest, and reasonable. *Stephens County Museum, Inc. v. Swenson,* 517 S.W.2d 257, 260 (Tex.Sup.1975); *Archer v. Griffith,* 390 S.W.2d 735, 740 (Tex.Sup. 1965); *Popperman v. Rest Haven Cemetery, Inc.,* 162 Tex. 255, 345 S.W.2d 715, 718 (1961). Evidence adduced by the defendant to meet his burden simply presents a question of fact. *Stephens County Museum, Inc. v. Swenson,* supra, at 517 S.W.2d 261.

Accordingly, Taub's proof of fairness did not entitle him to summary judgment.

■ Ginther's and Warren's alternative action for *quantum meruit* is based upon their efforts developing the Alexander lease and finding a driller. They say the work was performed by them as owners of the lease. If it was, Taub's interposition of the Real Estate License Act and the Texas Securities Act to defeat that claim is without merit. The Real Estate License Act expressly excludes transactions by owners from its operation. Article 6573a, Sec. 6(4). And, isolated dealings by owners of oil, gas and mineral interests do not fall within the operation of the Securities Act. Article 581–5, Sec. Q. Additionally, the record shows that Good Hope Refineries was assigned an undivided working interest in the Alexander lease for producing oil on the lease, as the result of Ginther's and Warren's efforts. It is well settled that the Securities Act does not apply to transactions between joint adventurers and partners. *Brown v. Cole,* 155 Tex. 624, 291 S.W.2d 704, 709 (1956).

■ It is undisputed that the fiduciary relationship of attorney-clients existed between MacNaughton and Ginther and Warren when they assigned the oil and gas properties to him to which they now claim equitable title. Although the transfers were absolute in their terms, Ginther and Warren testified they were made with the understanding that MacNaughton would reassign the properties when he had collected the full amount of his fee from the income produced by the properties. Under the rules set forth above relating to transactions between fiduciaries, it was MacNaughton's burden to establish that the assignments were unconditional and that the transaction was fair and reasonable in order to defeat Ginther's and Warren's claim of equitable title. His proof in that regard did not entitle him to summary judgment.

Ginther's and Warren's contention that MacNaughton agreed to reconvey the property is supported in the record by a letter from him to them dated August 2, 1973, and signed by him, discussing the arrangement. Therefore, the Statute of Frauds, V.T.C.A., Bus. & Com. § 26.01, does not support the summary judgment in MacNaughton's favor.

■ Apparently relying upon the doctrines of res judicata and estoppel by judgment, MacNaughton contends that the order of the Bankruptcy Court approving Ginther's and Warren's application to assign the properties to him is a bar to their suit to establish their equitable title and obtain reconveyance. We disagree. MacNaughton and Ginther and Warren were not adversaries in the Bankruptcy Court, and the differences now raised between them were not tried and determined there. In an affidavit attached to the application, MacNaughton stated that he would "be paid his fees for services . . . by either payment in monies that may be hereafter earned or in conveyance of property interest reverted in each of said Debtors-in-Possession, or both, as the case may be." Insofar as the record shows the Bankruptcy Court's order was based solely upon that representation without any knowledge or determination by the Court of the actual agreement between the parties. The order simply approves "that certain agreement" between the parties for payment of MacNaughton's fees. It does not purport to interpret the terms of the agreement. The elements of res judicata and collateral estoppel are not established in the record. See *Benson v. Wanda Petroleum Co.,* 468 S.W.2d 361, 362 (Tex.Sup.1971); *Swilley v. McCain,* 374 S.W.2d 871, 874 (Tex.Sup. 1964); *Lozano v. Patrician Movement,* 483 S.W.2d 369, 371 (Tex.Civ.App.—San Antonio 1972, writ ref'd n. r. e.).

Taub and MacNaughton bring forward cross points in which they question the trial court's order overruling their motions to reinstate a prior judgment in this case. The prior judgment was rendered after a jury trial, but it was set aside on motion for new trial. The cross points are without merit, and they are overruled without further discussion.

The summary judgment is reversed, and this case is remanded for trial.