Helen B. WILS, Attorney Ad Litem, Appellant,

v.

George A. ROBINSON, individually; Charter National Bank, Houston, Henry J.N. Taub, II, and Anthony J.A. Bryan, Trustees; and George A. Robinson, IV, Appellees.

No. 14–95–00909–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 26, 1996.

Rehearing Overruled Dec. 5, 1996.

Larry D. George, Kathleen Hopkins Alsina, Helen B. Wils, Houston, for appellant.

William D. Noel, William T. Miller, Elizabeth Ann Wiley, David B. Rae, Houston, for appellees.

Before LEE, YATES and O'NEILL, JJ.

## OPINION

O'NEILL, Judge.

This is an appeal from a judgment rescinding and terminating a trust upon application of its settlor and primary beneficiary, George A. Robinson, IV. Helen B. Wils, the attorney ad litem appointed to represent the interests of the unborn, minors, and other contingent beneficiaries of the trust, brings this appeal challenging the trial court's judgment. We reverse and render.

### Background

On December 30, 1986, George A. Robinson and his attorney, Joe E. Coleman, attended a meeting at the law offices of Fulbright & Jaworski to sign documents reflecting the settlement of a family dispute between Robinson, his mother, and his brother. During the meeting, Robinson signed all of the documents presented to him by Coleman, allegedly without reading them. Among the documents presented by Coleman was a trust agreement creating the George A. Robinson Irrevocable Grantor Trust No. 6 (the Trust).[1] The Trust was created with property that belonged solely to Robinson. The corpus of the Trust is valued at approximately $1.356 million and is comprised of real property,

---

1. Robinson's counsel argued at the hearing before the trial court that the trust agreement was not a part of the family dispute settlement. However, no evidence was presented to this effect.

limited partnerships, cash equivalents, and royalty interests.

At the time Robinson signed the trust agreement, he was twenty-seven years old, mentally competent, and not otherwise impaired. Robinson testified he did not read the trust agreement before signing it, but acknowledged that no one prevented him from reading the trust agreement. He further testified that Coleman did not explain it to him, and that he relied on Coleman to represent his interests.

As a result of signing the trust agreement, Robinson gave up ownership and control of his property and created a Trust that eventually earned Coleman and his firm over $60,000 in legal fees. Robinson, the purported settlor and primary beneficiary, claims he obtained no substantial benefit from the creation of the Trust, although he did receive income from the Trust. In 1992, Robinson brought suit against Coleman, which resulted in a settlement whereby Henry J.N. Taub, II, was appointed by the court as substitute trustee to take the place of Coleman. Robinson did not contest the validity of the Trust in that action. Robinson took no action to revoke the Trust or dispute its validity until this suit was filed in 1994, eight years after the creation of the Trust.

After an evidentiary hearing, the trial court entered judgment in favor of Robinson concluding that the Trust should be terminated and rescinded. On request, the trial court filed Findings of Fact and Conclusions of Law, but refused the ad litem's request for additional findings and conclusions. In six points of error, Wils contends the trial court erred in finding that the Trust should be terminated or rescinded.

### Termination

In her first point of error, Wils contends the trial court erred in terminating the Trust under § 112.054(a)(2) of the Texas Property (Trust) Code.

▮ A settlor may terminate a trust unless it is irrevocable by the express terms of the instrument creating it or of an instrument modifying it. TEX. PROP.CODE ANN. § 112.051 (Vernon 1995); *Citizens Nat'l*

*Bank v. Allen*, 575 S.W.2d 654, 657 (Tex.Civ. App.—Eastland 1978, writ ref'd n.r.e.). Irrevocability of a trust must be shown by the terms and language of the trust instrument creating the trust or by a supplement or amendment, and not by inference or implication. *McCauley v. Simmer*, 336 S.W.2d 872, 881 (Tex.Civ.App.—Houston 1960, writ dism'd). It is undisputed that the terms and language of the Trust make it irrevocable. Specifically, the trust agreement states:

> That I, GEORGE A. ROBINSON, ... have *irrevocably* granted, conveyed, assigned, transferred and delivered, and by these presents do *irrevocably* grant, convey, assign, transfer and deliver to ... TRUSTEES, their successors and assigns, as Trustees, the property described ... hereinafter called the trust property. TO HAVE AND TO HOLD the trust property, ... forever.
>
> This transfer is <u>IN TRUST, NEVERTHELESS,</u> and the property so *irrevocably* conveyed shall be held, administered and distributed by the Trustees upon the terms and conditions hereinafter set forth.

### ARTICLE XVII

> This Indenture of Trust shall be *irrevocable* and shall vest in the Trustees all right, title and interest in and to the properties deposited hereunder. *The Donor reserves to himself no right to alter or amend or revoke in any manner this Indenture of Trust.*

(emphasis added).

▮ Though a trust is irrevocable by its terms, it may still be terminated in whole or in part if:

(1) the purposes of the trust have been fulfilled or have become illegal or impossible to fulfill; or

(2) because of circumstances not known to or anticipated by the settlor, compliance with the terms of the trust would defeat or substantially impair the accomplishment of the purposes of the trust.

TEX. PROP.CODE ANN. § 112.054(a)(1) & (2) (Vernon 1995). Relying upon this statute, the trial court found that "the George A.

Robinson Irrevocable Grantor Trust No. 6 should be terminated ... because the circumstances not known to or anticipated by the Settlor would defeat or substantially impair the accomplishment of the purposes of the trust." This conclusion is based upon the trial court's finding of fact number eighteen:

> Since Mr. Robinson did not intend that a Trust be created and the property in the Trust is not protected from creditors of Mr. Robinson, the Trust had no purpose and, therefore, the purpose has been frustrated.

The trial court apparently concluded that, because Robinson purportedly did not know he was creating a trust, the Trust had no purpose and could be terminated under § 112.054(a)(2). We disagree with the trial court's application of § 112.054(a)(2).[2]

■ The trust agreement provides that the Trust is to be held and administered for Robinson's benefit during his lifetime. One-half of the net income from the Trust is to be paid to Robinson during his lifetime. The remaining half is to be paid to Robinson for his benefit at the discretion of the trustees, and any income not distributed is to be added to the corpus of the Trust. The Trust terminates twenty-one years after the death of Robinson's mother, Josephine Abercrombie, or upon Robinson's death, whichever occurs first. If Robinson survives twenty-one years after the death of his mother, the principal and income of the Trust are to be paid to him. If the terminating event is Robinson's death, the principal and income are to be divided among his surviving "bodily descendants" per stirpes and placed in separate trusts to be administered under the same terms that governed the original Trust. If Robinson dies without bodily descendants, the Trust principal and income are to be transferred and delivered "free of trust" to the trustees of the J.S. Abercrombie Foundation, a charitable trust. Robinson has the testamentary power to appoint outright all or part of the Trust property and income, in trust or otherwise, to anyone except himself, his creditors, his estate, or the creditors of his estate.

The trust document reveals the clear purposes for which the Trust was created: (1) to provide income to Robinson during his lifetime; and (2) to protect the corpus of the Trust for future distribution to the remainder beneficiaries. Robinson acknowledged that these were the purposes of the Trust. The Trust benefited not only Robinson, but his unborn children and grandchildren.[3]

■ Section 112.054(a)(2) provides that a trust may be terminated if, because of circumstances unknown or unanticipated by the settlor, compliance with the trust terms would defeat or impair the purposes of the trust. For example, in *Gregory v. MBank Corpus Christi, N.A.*, 716 S.W.2d 662 (Tex. App.—Corpus Christi 1986, no writ), an irrevocable trust was established by a foundation for the benefit of fifty-one charitable organizations. *Id.* at 664. The trust, by its terms, was established as a reaction to a pending federal lawsuit over membership on the board of directors of the foundation. *Id.* at 664–65. The trust document provided that the trustee would hold and invest the trust funds until a final judgment was entered in the federal suit and all appeals were complete. *Id.* at 665. However, when the federal suit had been pending for four years with no resolution in sight, and the trust held over $18 million that could not be dispersed, the foundation and the trustee filed suit to terminate or modify the trust to allow distribution of the trust funds. *Id.* The trial court found, relying on § 112.054(a)(2), that the long delay in federal court was a circumstance not anticipated when the trust was created, and that the delay substantially impaired the accomplishment of the purposes of the trust. *Id.* at 666. The trial court modified the terms of the trust so that the trust purposes could be carried out. *Id.* The appellate court upheld the trial court's judgment. *Id.* at 666–67.

---

**2.** Conclusions of law are reviewable *de novo* as questions of law. *Zieben v. Platt*, 786 S.W.2d 797, 801–02 (Tex.App.—Houston [14th Dist.] 1990, no writ).

**3.** The record shows that on the date of the hearing on the motion to terminate, Robinson was expecting a child "any time now."

Section 336 of the Restatement of Trusts, which is substantially similar to § 112.054(a)(2), contains comments providing examples of circumstances not known or anticipated by a settlor that would justify termination of a trust. *See* RESTATEMENT (SECOND) OF TRUSTS § 336 (1959). For instance, if a testator devises his farm in trust for the sole purpose of continuing farming operations and then, because of a change in circumstances, it becomes impossible to carry on the farming operations except under circumstances that would ultimately result in the loss of the farm, termination is justified. *Id.* at cmt. b. However, if continued farming operation was not the sole purpose of the trust, termination would not be justified. *Id.*

■ In the present case, the circumstance allegedly unknown to Robinson was the fact that he was creating a trust. This does not mean, however, that the Trust has no purpose or that the accomplishment of that purpose has been defeated or substantially impaired. The Trust income can still be dispersed to Robinson during his lifetime, and the corpus reserved for the remainder beneficiaries. Unlike in *Gregory* and the examples provided in the Restatement, there is nothing in the record to show that, even though Robinson may not have known he was creating a trust, compliance with the terms of the Trust would defeat or substantially impair its purposes. Even the trial court acknowledged the limited circumstances under which an irrevocable trust may be terminated under § 112.054(a)(2): "I am concerned that the legislature appears to have limited the occasions upon which a Court can terminate to those of fulfillment and total frustration."[4] If Robinson did not intend to create the Trust, his remedy is to

seek rescission on the basis of mistake, fraud, duress or undue influence. Robinson in fact sought and obtained rescission of the Trust based upon undue influence, which forms the basis of appellant's second point of error. We simply do not believe that the circumstances presented justify termination of the Trust under § 112.054(a)(2).

■ Neither the fact that Robinson has testamentary power of appointment under the Trust, nor the fact that the spendthrift provisions of the Trust have failed, defeats or substantially impairs the purposes of the Trust. *See Fewell v. Republic Nat'l Bank,* 513 S.W.2d 596, 598 (Tex.Civ.App.—Eastland 1974, writ ref'd n.r.e.). Robinson's bodily descendants have a remainder interest even though Robinson can defeat their interest by exercising his general power of appointment, and the purposes of the Trust in this regard have not become impossible of accomplishment or illegal. *Id.* at 598–99. In addition, because the Trust has purposes other than creditor protection for Robinson, the spendthrift provisions are severable and the Trust is not terminable. *Id.* We hold that as a matter of law, the Trust was not terminable under § 112.054(a)(2).[5] Point of error one is sustained.

### Rescission

In her second point of error, Wils contends the trial court erred in rescinding the Trust "as a result of the facts and circumstances surrounding its creation." She contends Robinson did not plead or prove undue influence, his alleged ground for rescission. Robinson responds that undue influence was pled and proved, and that he is also entitled to rescission pursuant to the principles set out in *Ginther v. Taub,* 570 S.W.2d 516 (Tex.Civ.

---

4. The trial court also acknowledged that it was stretching the application of § 112.054(a)(2):

> THE COURT: Well, the statute doesn't clearly say that I have the authority to do what I did. I mean, there's no question about that. The statute doesn't say if you are screwed by your lawyer you have a right to revoke an irrevocable trust.
>
> That's just a decision I have to make based on all the facts and circumstances. He didn't intend to create the trust, he didn't need the trust or want the trust, and there it was.

5. Neither is the Trust terminable under § 112.054(a)(1). Robinson admitted that the purposes of the Trust have not been fulfilled. Furthermore, there is no evidence to show the purposes of the Trust have become illegal or impossible to fulfill. *See* TEX. PROP.CODE ANN. § 112.054(a)(1). *See also Frost Nat'l Bank v. Newton,* 554 S.W.2d 149, 154 (Tex.1977) (holding that a trust cannot be judicially terminated on the ground that its primary purposes have been fulfilled where the trust expressly provides for termination upon the happening of a specified event).

App.—Waco 1978, writ ref'd n.r.e.). While a liberal construction of Robinson's pleadings indicates that undue influence was pled, we do not agree that undue influence was proven or that *Ginther* entitles Robinson to rescission.

■ In determining whether rescission was proper based upon undue influence, we first turn to § 333 of the Restatement of Trusts, which provides:

> A trust can be rescinded or reformed upon the same grounds as those upon which a transfer of property not in trust can be rescinded or reformed.

RESTATEMENT (SECOND) OF TRUSTS § 333 (1959). Thus, an irrevocable trust may be rescinded only where the settlor proves fraud, duress, undue influence, or mistake. RESTATEMENT (SECOND) OF TRUSTS § 333 cmt. a (1959). *See also* RESTATEMENT (SECOND) OF PROPERTY § 34.7 (1992) (stating that donative transfer may be set aside on grounds of undue influence, duress, or fraudulent representations); *Cruse v. Leary*, 727 S.W.2d 408, 410 (Ky.Ct.App.1987).

■ In Texas, the rules guiding determination of the existence of undue influence apply substantially alike to wills, deeds, and other instruments. *Rankin v. Rankin*, 105 Tex. 451, 151 S.W. 527, 529 (1912); *DeGrassi v. DeGrassi*, 533 S.W.2d 81, 85 (Tex.Civ. App.—Amarillo 1976, writ ref'd n.r.e.); *Bradshaw v. Naumann*, 528 S.W.2d 869, 871 (Tex. Civ.App.—Austin 1975, writ dism'd). Undue influence is defined as "such influence or dominion as exercised at the time, under the facts and circumstances of the case, which destroys the free agency of the testator, and substitutes in the place thereof the will of another." *Long v. Long*, 133 Tex. 96, 125 S.W.2d 1034, 1035 (1939); *Grohn v. Marquardt*, 657 S.W.2d 851, 855 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.); *Folsom v. Folsom*, 601 S.W.2d 79, 80 (Tex.Civ.App.— Houston [14th Dist.] 1980, writ ref'd n.r.e.). Undue influence has also been defined as "that dominion acquired by one person over the mind of another which prevents the latter from exercising his discretion, and which destroys his free agency." *Daily v. Wheat*, 681 S.W.2d 747, 750–51 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *Hill v. Parker*, 239 S.W.2d 219, 221 (Tex.Civ.App.— Texarkana 1951, writ ref'd n.r.e.). Undue influence is "that which compels the testator to do that which is against his will from fear, the desire of peace, or some other feeling which he is unable to resist." *Id.* In sum, undue influence occurs when the dominion and influence of one person over another is so strong as to destroy the free will to act.

■ In deciding whether there has been undue influence, the court should consider three factors: (1) the existence and exertion of an influence; (2) whether the influence operated to subvert or overpower the person's mind when executing the document; and (3) whether the person would have executed the document but for the influence.[6] *See Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex.1963); *Molnari v. Palmer*, 890 S.W.2d 147, 149 (Tex.App.— Texarkana 1994, no writ). The burden of proof is on the party claiming undue influence to prove that the instrument in question is the product of such influence and that the influence existed at the very time the instrument was executed. *Rothermel*, 369 S.W.2d at 922; *Bradshaw*, 528 S.W.2d at 871; *Schmidt v. Schmidt*, 403 S.W.2d 531, 534 (Tex.Civ.App.—Waco 1966, no writ). The evidence produced must clearly show that such pressure of persuasion has been exerted upon the settlor that his free agency is destroyed and the will of the wrongdoer is

---

**6.** The Restatement lists the following factors as those which "may be of importance" on the question of undue influence: (1) whether and to what extent a fiduciary or confidential relationship existed at the time of the creation of the trust between the settlor and the person persuading him to create the trust; (2) whether it was the trustee, the beneficiaries, or a third person who persuaded the settlor in creating the trust; (3) the improvidence of the settlor in creating the trust; (4) whether the settlor when he created the trust had independent legal advice; (5) the age, health, business competence, and intelligence of the settlor; (6) whether the trust is of such a character that it would be natural for a person in the position of the settlor to create it when not unduly influenced by others. RESTATEMENT (SECOND) OF TRUSTS § 333 (1959). We will consider such factors only as they may relate to the definition of undue influence established by case law in Texas.

substituted therefor. *See Eulenfeld v. Weber,* 428 S.W.2d 383, 387 (Tex.Civ.App.—Austin 1968, writ ref'd n.r.e.). Undue influence may be proved by circumstantial, as well as direct, evidence; however, the circumstances "must be of a reasonably satisfactory and convincing character." *Rothermel,* 369 S.W.2d at 922; *Folsom,* 601 S.W.2d at 81.

In *Rothermel,* which involved a will contest,[7] the Texas Supreme Court articulated the proof necessary to show undue influence. Mrs. Rothermel executed a will in 1939 in which she divided her estate equally among her two sons. *Rothermel,* 369 S.W.2d at 919. When her husband died, her son Louis left school and assumed responsibility for his mother and brother. *Id.* Mrs. Rothermel relied on Louis to handle all of her affairs. *Id.* In 1957 or 1958, Mrs. Rothermel told Louis she wanted to make another will leaving everything to him. *Id.* at 921. Mrs. Rothermel was 93 years old and suffered from common maladies of age, including hearing loss and poor eyesight. *Id.* Louis drew the new will, and no attorney was consulted. *Id.* Mrs. Rothermel signed the will and it was witnessed by two of Louis' employees. *Id.* No one read or explained the will to her or saw her read it. *Id.* After the will was signed, Louis placed it in his safe-deposit box. *Id.* No one knew of its execution except Mrs. Rothermel, Louis, and the witnesses until some time after Mrs. Rothermel's death. *Id.*

Mrs. Rothermel's grandchildren brought suit contesting the will, claiming that Mrs. Rothermel's age, Louis' interest and influence, and the circumstances surrounding the signing of the will supported a finding of undue influence. *Id.* Evidence in the record revealed that witnesses overheard Mrs. Rothermel say she intended to leave her estate equally to her grandchildren. The jury found undue influence had been exercised upon the deceased by her son Louis, and the trial court entered judgment in favor of Mrs. Duncan. *Id.* at 920. The court of appeals affirmed, and the case was appealed to the supreme court. *Id.*

In reviewing the sufficiency of the evidence to support the jury's finding of undue influence, the supreme court emphasized that influence is not undue unless the "free agency of the testator is destroyed and a testament produced that expresses the will of the one exerting the influence." *Id.* at 922. The court noted that not every influence exerted by one person on the will of another is undue. *Id.* In fact, one may request or even importune and entreat another to execute a favorable instrument; but unless the entreaties are shown to be "so excessive as to subvert the will of the maker, they will not taint the validity of the instrument with undue influence." *Id.* The exertion of undue influence cannot be inferred alone from opportunity; there must be some testimony, direct or circumstantial, to show the influence was present and in fact exerted. *Id.* at 923. After reviewing the facts under the law stated, the court held there was no evidence of undue influence. *Id.* at 924.

In the present case, even if we were to accept every statement made by Robinson as true and indulge all reasonable inferences therefrom in his favor, there is no evidence of undue influence as defined in *Rothermel.* Robinson's sole complaint is that Coleman presented the Trust indenture to him, along with several other documents, without telling him what it was or discussing it with him. Robinson was competent at the time he executed the document. He freely admitted that while he did not read the document, no one prevented him from doing so. A party to an agreement has an obligation to protect himself by reading what he signs. *G–W–L, Inc. v. Robichaux,* 643 S.W.2d 392 393 (Tex. 1982) (citing *Thigpen v. Locke,* 363 S.W.2d 247 (Tex.1962)). Unless there is some showing of fraud, apart from the fact the party failed to read what was put before him, a party may not excuse himself from the consequences of failing to meet that obligation. *Robichaux,* 643 S.W.2d at 393 (citing *Courseview, Inc. v. Phillips Petroleum Co.,* 158 Tex. 397, 312 S.W.2d 197 (1957)). While the record shows that Robinson trusted and relied

---

7. Though *Rothermel* is a will contest case, as we have already stated, the rules regarding undue influence apply substantially alike to wills, deeds, and other instruments. *See Rankin,* 151 S.W. at 529; *DeGrassi,* 533 S.W.2d at 85; *Bradshaw,* 528 S.W.2d at 871.

on Coleman as his attorney, there is nothing to indicate Coleman applied such influence or dominion that it destroyed Robinson's free agency and substituted his own. *See Long*, 125 S.W.2d at 1035; *Grohn*, 657 S.W.2d at 855; *Folsom*, 601 S.W.2d at 80. Nor is there any evidence to suggest that Coleman had such dominion over Robinson's mind that Robinson was prevented from exercising his own discretion. *See Daily*, 681 S.W.2d at 750–51; *Hill*, 239 S.W.2d at 221. Finally, there is no evidence that Robinson was compelled to sign the indenture out of fear, desire for peace, or any other feeling that he could not resist. *Id.* Accepting all of the trial court's findings of fact and all of the evidence presented by Robinson, we find that as a matter of law there is no evidence to support a finding of undue influence.

■ Robinson next argues that he is entitled to rescission under the principles set out in *Ginther v. Taub*, 570 S.W.2d 516 (Tex.Civ. App.—Waco 1978, writ ref'd n.r.e.). In *Ginther*, plaintiffs sued to recover equitable title to two-thirds or, alternatively, one-half of Taub's recorded interest in an oil, gas, and mineral lease on the ground that the conveyance of their interest in the lease was induced by fraud, breach of fiduciary duty, conspiracy, and undue influence on the part of Taub and his attorney, MacNaughton. *Id.* at 518. The plaintiffs and Taub had known each other since the 1950s and had participated in forty to fifty oil and gas ventures. *Id.* at 520. Their agreements were often oral and only later reduced to writing, and the plaintiffs trusted Taub "as much as anybody could." *Id.* The plaintiffs claimed they never intended to convey an absolute interest in the lease to Taub, and that the documents that allegedly did so were prepared by their attorney, MacNaughton, who also happened to represent Taub in the deal. *Id.* at 522–24. The trial court granted the defendants' motion for summary judgment, but the appellate court reversed finding there was conflicting evidence supporting every theory upon which the plaintiffs sought to avoid the assignments. *Id.* at 525. Noting the evidence that there existed a fiduciary relationship between the plaintiffs and both defendants, the supreme court stated:

Where the plaintiff establishes that the transaction which he seeks to avoid was executed when a fiduciary relationship existed between him and the defendant, *equity* indulges the presumption of unfairness and invalidity, and casts upon the defendant claiming validity and benefits of the transaction the burden of proving that it is fair, honest, and reasonable.

*Id.* (citations omitted)(emphasis added). The court held that it was MacNaughton's burden to prove the assignments were fair and reasonable, and that his summary judgment proof was inadequate to sustain this burden. *Id.* at 526.

Relying upon *Ginther*, Robinson argues that, because he had a fiduciary relationship with Coleman, the burden was on the ad litem to prove that the creation of the Trust was fair, honest, and reasonable. Robinson claims the ad litem failed to provide evidence necessary to meet this burden and, therefore, the trial court was justified in ordering rescission. We do not believe that *Ginther* supports the equitable remedy of rescission in this case.

In *Ginther*, the court determined that when a transaction sought to be voided was executed when a fiduciary relationship existed between the plaintiff and the defendant, *equity* shifts the burden of proof to the defendant to prove that the transaction is fair, honest, and reasonable. *Id.* In order to invoke the equitable remedy of rescission, the plaintiff must not have acquiesced in or accepted benefits under the transaction sought to be voided. *See Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 164 (Tex.App.—Houston [14th Dist.] 1991, no writ). As the trial court in the present case recognized, "[t]he problem with the equitable rescission theory is that your client accepted benefits. There are problems with the equitable rescission theory."

■ The ad litem contends Robinson is estopped to seek equitable rescission because he accepted benefits under the Trust and took positions inconsistent with his present claim that he did not know the Trust was being created. Although the ad litem uses the term estoppel, her argument sounds more in quasi-estoppel, which precludes a

party from asserting, to another's disadvantage, a right inconsistent with a position he has previously taken. *Enochs v. Brown,* 872 S.W.2d 312, 317 (Tex.App.—Austin 1994, no writ); *Vessels v. Anschutz Corp.,* 823 S.W.2d 762, 765 (Tex.App.—Texarkana 1992, writ denied); *Steubner Realty,* 817 S.W.2d at 164. *See also* 31 C.J.S. *Estoppel* § 107 (1964). The doctrine applies where it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or by which he accepted a benefit. *Steubner Realty,* 817 S.W.2d at 164. Quasi-estoppel is in essence a term applied to certain legal bars such as ratification, election, acquiescence, or acceptance of benefits. *Id.* (citing 31 C.J.S. § 107 (1964)). Unlike estoppel, quasi-estoppel does not require a party to show a false representation or detrimental reliance. *Enochs,* 872 S.W.2d at 317; *Vessels,* 823 S.W.2d at 765; *Steubner Realty,* 817 S.W.2d at 164.

In *Steubner Realty,* Cravens Road 88, Ltd. owned a tract of land in Missouri City that it wished to sell. 817 S.W.2d at 162. Fincher, a general partner in Cravens Road, negotiated a sale with Aramburo, a general partner of Steubner 19, Ltd. *Id.* Before the sale, Fincher informed Aramburo that Missouri City required dedication of a 120–foot easement on the property for drainage before the property could be developed. *Id.* Fincher attempted to negotiate with Missouri City for payment for the easement rather than dedication, but was unsuccessful. *Id.* Aramburo notified his partners about the easement, and the sale was consummated at a reduction from the previously agreed upon price. *Id.* After the sale, Aramburo learned that the easement extended onto property still owned by Cravens Road, and that his company could not develop the property unless Cravens Road agreed to dedicate part of its land for the easement. *Id.* When Steubner 19 did not make its first payment, the property was foreclosed. *Id.* Steubner 19 filed suit alleging fraud and negligent misrepresentation. Although the jury found Cravens Road had made misrepresentations that the property was ready for development and that Steubner 19 had relied on these misrepresentations in deciding to purchase the property, the jury also found Steubner 19 was es-

topped from complaining about the drainage problems. *Id.* at 162–63. Based upon the estoppel finding, the trial court entered a take nothing judgment against Steubner 19. *Id.* This court upheld the trial court's judgment, noting that Steubner 19 knew of the drainage easement and obtained a reduction in the purchase price as a result. *Id.* at 164. Because Steubner 19 knew of the easement, quasi-estoppel barred it after purchasing the property from taking the inconsistent position that it had no knowledge of the impediment to development. *Id.*

In the present case, the record shows that Robinson accepted benefits under the Trust. Taub, one of the three current trustees of the Trust, testified that some $20,000 in income had been distributed to Robinson under the Trust. Robinson accepted this income and has never offered to return it to the Trust. Regardless of whether Robinson would have otherwise been entitled to this income, the distribution of income to Robinson was a purpose of, and benefit under, the Trust. In addition, Robinson paid Coleman at least $20,000 for serving as trustee of the Trust without ever challenging the Trust's validity. Although Robinson ultimately filed suit against Coleman in 1992, it does not appear that the validity of the Trust was ever challenged in that suit. Rather, there was a settlement whereby Coleman was removed as trustee and Taub was appointed by the court to take his place. Robinson acquiesced in the appointment of the substitute trustee, thereby affirming the validity of the Trust. It was not until eight years after creation of the Trust, after accepting benefits thereunder and acquiescing in the appointment of a substitute trustee, that Robinson claimed he lacked knowledge of its creation and sought rescission. Under these circumstances, we do not believe Robinson is entitled to invoke the equitable burden shifting applied in *Ginther* and require the ad litem to assume the burden of proving the fairness and validity of the Trust.

Point of error two is sustained.

Having sustained the ad litem's first two points of error, we find it unnecessary to address her remaining points. The judg-

ment of the trial court is reversed and judgment rendered in favor of the ad litem. The Trust was improperly terminated and rescinded and is hereby reinstated to continue according to its terms.