11th Court of Appeals
Eastland, Texas
Memorandum Opinion
 
In re Estate of William B. Lathem, Sr., Deceased
            No. 11-04-00041-CV -- Appeal from Ector County
 
            Joyce Lathem sought to probate the last will and testament, dated February 6, 1998, of her
husband, William B. (Bill) Lathem, Sr. Bill died on January 26, 2002. Joyce was Bill’s second wife,
and they were married in 1997. Barbara Cates and Nancy Tatum, adult children from Bill’s first
marriage, brought this will contest. Bill was married to his first wife, Lizzie B. Lathem, for 54 years
until Lizzie B. died in 1995. In this action, Barbara and Nancy alleged that Bill executed the will
in question and other documents – two warranty deeds, two certificates of deposit, and a change of
beneficiary on his life insurance policy – as a result of undue influence exerted by Joyce. The jury
found that Bill executed the will and the other documents as a result of undue influence. Based on
the jury’s verdict, the trial court entered judgment in favor of Barbara and Nancy nullifying and
setting aside the various instruments. The trial court awarded attorney’s fees to Barbara and Nancy. 
In this appeal, Joyce argues that the evidence was legally and factually insufficient to support the
jury’s findings of undue influence. We affirm.
Background Facts
            Joyce and Bill were married on November 7, 1997. Joyce was 47 years old, and Bill was 82
years old. Within two months, on January 5, 1998, Bill signed a change of beneficiary form on his
life insurance policy designating Joyce as the beneficiary. Bill executed the will in question on
February 6, 1998. Bill executed the certificates of deposit on February 3, 1999, and September 30,
1999. The certificates of deposit (CD) named Joyce as a co-owner with right of survivorship. The
February 3, 1999, CD was in the amount of $100,000; the September 30, 1999, CD was in the
amount of $90,000. Bill executed the warranty deeds conveying property in Ector County and
Brown County to Joyce on December 18, 2001.
 
Issues Presented
            Joyce presents 12 issues for review. In her first 10 issues, she argues that the evidence was
legally and factually insufficient to support the jury’s findings of undue influence. In her eleventh
and twelfth issues, she asserts that, because the evidence was legally and factually insufficient to
support the jury’s undue influence findings, (1) the trial court erred in nullifying the will, the
warranty deeds, the certificates of deposit, and the change in life insurance beneficiary and (2) the
trial court erred in awarding attorney’s fees to Barbara and Nancy.
The Evidence at Trial
            Joyce testified at trial. Regina Robinson and Terry Donk were her witnesses. Regina was
Joyce’s sister. Donk practiced law in Odessa and prepared the subject will and warranty deeds. 
Barbara and Nancy also testified at trial, and their witnesses were Evelyn Nell Carlson and Darrell
Corzine. Evelyn was Bill’s longtime neighbor in Odessa. Corzine represents Barbara and Nancy
in this action. He testified on attorney’s fees issues.
Joyce Lathem’s Testimony 
            Joyce testified that she lived in the Brownwood area. At trial, Joyce said that she was a
certified nurse’s aide. She acknowledged testifying in her deposition that she was a licensed
vocational nurse, which was not true.
            Joyce said that she met Bill and Lizzie B. in Brownwood around 1978. Bill and Lizzie B.
lived in Odessa, but they often visited their place in Brownwood until Lizzie B. died in 1995. Joyce
and her family would see Bill and Lizzie B. when they were in Brownwood. Joyce said that she and
her family loved Bill and Lizzie B.
            Joyce testified that she continued her friendship with Bill after Lizzie B.’s death. Bill sent
her notes and letters and called her. On February 1, 1996, Bill came to see her in Brownwood, and
then Joyce went to Odessa with Bill. Joyce said that Bill did not appear to be depressed or sad over
Lizzie B.’s death at that time. 
            Joyce stayed with Bill for three nights in Odessa. Bill wanted his children to meet her. 
According to Joyce, Barbara came to the house and asked what her intentions were toward Bill.
Joyce told Barbara that she needed to ask Bill what his intentions were. Joyce said that she could
feel “coldness” coming from Barbara. Later, Barbara called Joyce and again asked what her
intentions were toward Bill. Joyce told her that it was none of her business and that, if she wanted
to know, she should ask Bill. Barbara asked her not to tell Bill about the call. At one time, Barbara
told her that Bill had mental problems, but Joyce did not believe Barbara. Joyce and Bill had their
mail forwarded from Odessa to Brownwood because Barbara took some mail out of their Odessa
mailbox. Joyce said that Barbara’s relationship with Bill deteriorated. She said that Bill neither
wanted to see or talk to Barbara nor wanted her to talk to Barbara.
            Joyce said that she and Bill visited Nancy and her family in Oklahoma two or three times. 
Nancy was very nice to Joyce in front of Bill. Joyce thought that everything was well with Nancy. 
Joyce testified that Bill had a relationship with Nancy, but Joyce did not consider it a good
relationship.
            Joyce testified that Bill brought up the subject of marriage and proposed to her in 1996. Bill
spent a lot of time with Joyce and her family in Brownwood during 1996 and 1997. Joyce and Bill
went on some vacations during that time period. Joyce said that neither her family nor Bill’s family
was in favor of the marriage. However, she also said that she and Bill did not tell anyone that they
were getting married. Joyce testified that Bill did not want to tell his children. Joyce said that Bill’s
family was mad at Bill and that they did not approve of her. Joyce and Bill got married on
November 7, 1997. They were married by a justice of the peace in Bonham County. Joyce was 47
years old, and Bill was 82 years old. 
            Joyce wrote Barbara a letter stating that she worked for two years after becoming involved
with Bill; but Joyce admitted during cross-examination that she did not report any income on her
1997 tax return. She acknowledged that she lived off of Bill’s money after establishing a
relationship with him. Bill wanted her to quit her job because he wanted to be with her.
            Donk prepared the will in question. Joyce said that Bill contacted Donk to schedule the
appointment. Joyce did not tell Donk that Bill’s children treated her unfairly or left her out of family
gatherings. Bill wanted to leave his property to her. Joyce testified that she did not try to get Bill
to make her the beneficiary of his life insurance policy or to change any of his CD accounts. She
said that she did not beg Bill to give her the Ector County and Brownwood County properties. 
             Joyce said that she neither prohibited Bill from visiting with his family nor ever interfered
with him visiting his family. She said that Bill did not want to go to any family affairs. Joyce said
that she tried to get Bill to make up with his family. Upon Barbara’s invitation, Joyce and Bill went
to Barbara’s house on Father’s Day in 2001. Joyce thought that things went fairly well on Father’s
Day. Bill recognized Barbara and her family and talked with them.
            Bill fell and broke his hip in Brownwood in December 2001. Joyce took Bill to the hospital. 
Joyce did not call Bill’s family because Bill did not want her to call them. Bill died in the hospital
on January 27, 2002. Joyce testified that she was not aware that the doctors had diagnosed Bill as
having long-term dementia. She said that the doctors could not have diagnosed Bill with long-term
dementia because they were not qualified to make the diagnosis. She said that the doctors did things
to cover their tracks.
            Joyce testified that she believed only one CD existed when Bill died. She said that they
opened a $100,000 CD and a $90,000 CD in 1999. She and Bill were joint tenants with right of
survivorship in the CDs. She said that she and Bill spent the money from the $90,000 CD. She only
identified one CD in her answers to interrogatories. However, during cross-examination, she
acknowledged receiving a statement dated December 31, 2001, showing a $90,000 CD and a
statement dated February 28, 2002, showing the $100,000 CD. However, she said that she still did
not believe that two CDs existed.
            Joyce called Donk about the warranty deeds about a month before Bill died. She said that
Bill wanted her to have the property. Joyce had testified in her deposition that Bill gave her the
property so that they could buy another home.
            Joyce said that Bill was in good physical and mental condition in 1996 and that he remained
that way until breaking his hip in 2001. She said that Bill did most of his personal grooming and
dressing.
Regina Robinson’s Testimony
            Regina, Joyce’s sister, testified that Bill and Lizzie B. were like grandpa and grandma to her.
She confirmed that Bill and Lizzie B. came to Brownwood often from 1990 to 1995. Regina said that
she continued a relationship with Bill after Lizzie B. died. They sent letters and cards to each other,
and they called each other. 
            Regina did not know that Bill and Joyce were going to get married, but she did not approve
of the marriage. Regina said that, from 1996 to 2000, Bill was very much a part of her family. She
continued to associate with and visit Bill up through 2001. Bill always appeared to know what he
was doing. After Lizzie B. died, Joyce’s relationship with Bill was basically the same. They were
not a usual husband and wife; they were friends. Bill and Joyce were best buddies.
            Regina said that Bill grieved greatly after Lizzie B. died. She is not aware of how long he
stayed in that condition.
Terry Donk’s Testimony
            Donk had been practicing law in Odessa since 1960. He practiced in real estate, probate, and
corporate matters. Donk prepared the will in question. Donk believed that Joyce called and made
the appointment to see him. Joyce and Bill wanted him to prepare new wills for them. Donk met
with Joyce and Bill and talked with them about what they wanted. Donk did not have any
discussions with Bill without Joyce being present. Bill wanted his property to go to Joyce if she
survived him; and, if Joyce predeceased him, he wanted half of his property to go to his children and
the other half of his property to go to Joyce’s relatives. Bill wanted a new will to protect Joyce from
claims that his family might have. Donk said that Bill was disappointed because he believed that
his children were being rude and unfair to Joyce. Joyce and Bill both told Donk things about Bill’s
children. Joyce wanted to leave all of her property to her relatives. Donk said that Bill seemed to
be normal and competent. Bill answered questions and asked questions intelligently.
            On a later date, Bill and Joyce came back to Donk’s office to sign the wills. Before they
signed the wills, Donk asked them whether they had read their wills and understood them. Bill said
that he understood the will. Bill signed his will on February 6, 1998. Donk said that Bill looked
perfectly normal.
            Donk said that, in 2001, Joyce called him to talk about some long-term CDs. Donk gave
Joyce his opinions about the CDs. Donk said that he never met with or talked with Bill about the
CDs.
            Donk believes that Joyce called him about the warranty deeds in December 2001. Bill or
Joyce told Donk that Bill’s children were threatening to contest Bill’s will. Donk suggested that, if
Bill wanted to give the property to Joyce, he should give it to her. By the deeds, Bill conveyed
property in Ector County and property in Brown County to Joyce. Bill also signed a power of
attorney in favor of Joyce on the same day. Donk did not specifically recall meeting with Bill about
the warranty deeds and the power of attorney, but he remembered Bill coming to his office to sign
the documents.
            Donk said that Bill appeared competent every time he saw him. Bill seemed to know what
he was doing on a day-to-day basis.
Nancy Tatum’s Testimony 
            Nancy and her husband live in Oklahoma. Nancy testified that she had a loving relationship
with her father. From 1990 until 1995, she and her family visited Bill and Lizzie B. in Odessa three
or four times a year. Their trips to Odessa usually lasted for four days. She said that Bill had a good
relationship with her children. Nancy tried to call her parents once a week, and they wrote letters
back and forth. Nancy said that she had a really good relationship with her dad from 1990 to 1995
and that they were very close.
            Nancy’s parents were married for 54 years. Lizzie B. died in 1995. Nancy and her family
came to Odessa to be with her father when Lizzie B. died. She said that her father was “just lost”
and cried a lot.
            Nancy testified that her father changed his will after Lizzie B. died. She said that Bill had
planned to leave everything to his children. Bill had accumulated two CDs, and he always referred
to the CDs as his children’s “nest egg.” Nancy said that Bill intended for the CDs to go to his
children.
            Nancy’s relationship with her father changed after he became involved with Joyce. Nancy
and her family came back to Odessa a few weeks after Lizzie B. died to check on Bill. Joyce was
at her father’s house. Nancy did not know Joyce and was shocked to see her there. Joyce said that
she and Bill needed to go to Brownwood. Nancy testified that Bill “just hopped up like a puppet”
and did what Joyce told him to do. Nancy and her family stayed in Odessa for several days, but Bill
and Joyce did not return to Odessa while Nancy and her family were there. Nancy called her father’s
house numerous times, but there was no answer.
            Nancy never saw her father without Joyce being present. Nancy was worried about her
father. She tried to call him every day but was usually unable to reach him. She said that, from 1995
to 1997, she was only able to talk to him on the phone once a month or every six weeks. She also
wrote him letters.
            Nancy said that, after Joyce became involved with Bill, she and her family were not welcome
at Bill’s house. When they did visit Joyce and Bill, they never stayed long. On some occasions,
Joyce and her dad would just leave. Nancy said that Joyce controlled all of the conversations. She
said that Bill was not the same after Lizzie B. died. He just sat there and did not do anything. Every
time Nancy saw him, he had lost more weight and had become more frail. Nancy said that there
were times when Bill did not recognize her. Joyce screamed at Bill telling him that it was Nancy.
Nancy said that she never made a scene or caused any problems with Joyce.
            Nancy said that Joyce and Bill visited her twice in Oklahoma. The first visit occurred in
1998. Nancy did not know that they were coming. Bill and Joyce stayed at a hotel. Nancy testified
that Bill did not recognize her at times during that visit. The second visit occurred in 1998 or 1999.
Nancy said Bill was very frail at the time and had difficulty getting into the truck.
            Nancy’s last conversation with her dad occurred in November of 2001. Joyce sent her a
Christmas card on December 14, 2001. Joyce did not let Nancy know that her dad was in the
hospital. On January 27, 2002, Joyce called Nancy and told her that Bill had died in the hospital. 
             Nancy did not know that Joyce and Bill were married until learning it at the funeral home.
Nancy asked Joyce for some personal items that were at Bill’s house. She called Bill’s house many
times and finally got Joyce’s sister, Regina. Regina was very ugly to her, told her not to call, and
hung up. Nancy left a note at the house about the personal items. She never received a response. 
             Nancy said that, from 1995 on, Bill’s condition deteriorated quite a bit. On occasions before
February 1998, he did not know who she was. When she saw him in 2001, he looked like “nothing 
but bones and dentures.” Joyce never allowed Nancy to be alone with Bill. Nancy thought that
Joyce was controlling her dad. He depended on Joyce for all of his needs. Nancy said that the will
and other documents in question did not express Bill’s wishes.
Barbara Cates’s Testimony
            Barbara and her husband, Phil, lived in Odessa. Barbara testified that she had a loving
relationship with her father. From 1990 to 1995, Barbara and her family visited Bill and Lizzie B.
at least once a week. They often spent Sundays with her parents, and they spent holidays with them.
Barbara’s children had loving relationships with Bill. Barbara and Phil also visited Bill and Lizzie
B. in Brownwood. Barbara said that she had a very good relationship with her dad from 1990 to
1995. Barbara saw her father every day in the weeks following Lizzie B.’s death. Bill wanted
companionship during the day. Barbara testified that Bill was never the same after Lizzie B.’s death. 
             Barbara said that, when Joyce came into the picture, her dad changed. Barbara met Joyce two
or three weeks after Lizzie B. died. Joyce met her at the door of her father’s house in Odessa. 
Barbara and her family did not stay very long because they were not welcome there. Barbara
testified that Joyce was in control. Bill did not say much of anything. Joyce did all of the talking. 
            Barbara tried to be nice to Joyce so that she could see her dad. Barbara asked Joyce what her
intentions were toward Bill. Barbara told Joyce that Bill had health problems and mental problems. 
Joyce became furious. For the following two years, Barbara did not see her father. She believes that
Joyce kept Bill away from his family. Barbara made many attempts to see Bill after Bill became
involved with Joyce. Many times, Joyce and her father would not answer the door even though they
were at home. Barbara saw her father four or five times between February of 1996 and when he
died. On some occasions before 1998, Bill did not know who Barbara was. On one occasion, Bill
told Barbara that he “ought to spit on her.” When Bill got confused, Joyce would scream at him. 
Joyce never left the room when Barbara and her family were with Bill. Barbara said that Joyce had
some type of control over him. Bill depended on Joyce for his every need.
            Barbara said that Bill and Lizzie B. wanted their children to have the CDs. Barbara and her
siblings were told all of their lives that they would get the CDs. 
            Barbara testified about Bill’s mental condition. Bill had hallucinations before 1995. He
reported seeing “little green men” to the FBI. The doctor prescribed medication for Bill’s condition.
Barbara said that Bill’s physical condition and mental condition deteriorated after 1995.
            Joyce did not let Barbara know that Bill was in the hospital in December 2001. Nancy called
Barbara to tell her that Bill had died. At that time, Barbara did not know that Joyce and Bill were
married or that Bill had executed a new will. Barbara said that the will and other documents in
question did not reflect Bill’s wishes.
Evelyn Nell Carlson’s Testimony
            Evelyn lived across the street from Bill and Lizzie B. in Odessa. She met Nancy at Bill and
Lizzie B.’s 50th wedding anniversary party. She said that Bill and Nancy appeared to be very close.
Evelyn said that Barbara visited Bill and Lizzie B. regularly before Lizzie B. died.
            Bill told Evelyn about Lizzie B.’s death the day after she died. Bill said that he had lost his
best friend. Thereafter, Bill’s physical appearance changed a lot. He lost a lot of weight and became
feeble. Evelyn testified that Joyce started staying with Bill soon after Lizzie B. died. Joyce and Bill
were in Odessa only for a few days during the first of every month. They took care of the lawn while
they were there. However, Bill got to where he could not do the yard.
            Evelyn testified that Bill could be hard to get along with. She also said that, if Bill had his
mind made up, you could not change it.
Medical Records 
            The medical records established that Bill had hallucinations during the spring of 1995. He
was treated with the medication Haldol. 
            The medical records from the VA hospital showed that, on January 29, 2001, Joyce’s sister
talked with health care personnel by phone. She was very concerned about Bill’s difficult behavior.
On the next day, Bill went to the VA hospital. Joyce said that Bill was often unsteady but so far had
not fallen. On that same date, Joyce requested a bedside commode, shower chair, and grab bar to
assist with Bill’s care.
            In October 2001, Bill reported to the Brownwood Clinic with a possible broken right forearm.
Joyce stated that Bill had been confused and had increased forgetfulness.
            On December 21, 2001, Bill fell and broke his hip. He was admitted to Brownwood
Regional Medical Center. The medical records indicated that Bill was confused. The physicians at
the hospital diagnosed Bill with a “significant amount of dementia” that they suspected had been a
long-term condition. The physicians believed that Bill would need to go to an Alzheimer’s unit. The
records also stated that Joyce had recently noticed the confusion. Joyce stated that Bill’s mental
status had declined in the last two to three weeks.
            During the hospitalization, Bill began experiencing abdomen problems. Bill’s condition
deteriorated, and the condition became life-threatening. The doctors recommended potentially life-saving treatments and also recommended various medications during the hospitalization, but Joyce
refused the treatments and medications. For example, on January 2, 2002, Joyce said that she did
not want anything else done for Bill at the hospital. She wanted him to be transferred, but he was
not stable for transfer. Also, on January 22, 2002, Joyce refused various treatments and refused all
medications. Joyce was adamant that no further surgical treatment be done. Bill died at the hospital
on January 27, 2002.
Darrell Corzine’s Testimony
            Corzine testified on attorney’s fees issues.
 Standards of Review
            Joyce’s first through tenth issues attack the legal and factual sufficiency of the evidence. As
will contestants, Barbara and Nancy had the burden of proof on the challenged undue influence
issues. Cobb v. Justice, 954 S.W.2d 162, 165 (Tex.App. - Waco 1997, pet’n den’d); Evans v. May,
923 S.W.2d 712, 715 (Tex.App. - Houston [1st Dist.] 1996, writ den’d). They obtained favorable
jury findings on those issues. In analyzing a legal sufficiency/no-evidence issue, we must consider
evidence in the light most favorable to the challenged finding and indulge every reasonable inference
that would support it. City of Keller v. Wilson, No. 02-1012, 2005 WL 1366509, at *10 (Tex. June
10, 2005). We must credit favorable evidence if a reasonable fact-finder could and disregard
contrary evidence unless a reasonable fact-finder could not. City of Keller v. Wilson, supra at *14. 
We must determine whether the evidence at trial would enable reasonable and fair-minded people
to find the facts at issue. City of Keller v. Wilson, supra. We may sustain a no-evidence challenge
only when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the
only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence
conclusively establishes the opposite of a vital fact. City of Keller v. Wilson, supra at *2. 
            In reviewing the factual sufficiency challenges to the jury’s findings, we must consider all
of the evidence and determine whether the evidence in support of the findings is so weak as to be
clearly wrong and manifestly unjust or whether the findings are so against the great weight and
preponderance of the evidence as to be clearly wrong and manifestly unjust. Dow Chemical
Company v. Francis, 46 S.W.3d 237, 242 (Tex.2001); Pool v. Ford Motor Company, 715 S.W.2d
629 (Tex.1986); Cain v. Bain, 709 S.W.2d 175, 176 (Tex.1986); Ellis v. City of Dallas, 111 S.W.3d
161, 164 (Tex.App. - Eastland 2003, no pet’n). We cannot reverse merely because we conclude that
a preponderance of the evidence supports the opposing answer and cannot substitute our opinion for
that of the trier of fact and determine that we would have reached a different conclusion. Herbert v.
Herbert, 754 S.W.2d 141, 144 (Tex.1988). The fact-finder is the sole judge of the credibility of the
witnesses and the weight to be given their testimony and any inconsistencies in the testimony. City
of Keller v. Wilson, supra at *2; McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex.1986). The
fact-finder may believe one witness and disbelieve others. McGalliard v. Kuhlmann, supra at 697. 
Undue Influence
            To establish a claim of undue influence, a contestant must prove the following elements: (1)
the existence and exertion of an influence; (2) the effective operation of such influence so as to
subvert or overpower the person’s mind when executing the document; and (3) the person would not
have executed the document but for the influence. Rothermel v. Duncan, 369 S.W.2d 917, 922
(Tex.1963); Cobb v. Justice, supra. The contestant bears the burden of proving the elements of
undue influence by a preponderance of the evidence. Cobb v. Justice, supra at 165; Evans v. May,
supra at 715. The rules guiding determination of the existence of undue influence apply
substantially alike to wills, deeds, and other instruments. Rankin v. Rankin, 151 S.W. 527, 529
(Tex.1912); Wils v. Robinson, 934 S.W.2d 774, 780 (Tex.App. - Houston [14th Dist.] 1996), writ
granted judgm’t vacated w.r.m., 938 S.W.2d 717 (Tex.1997); DeGrassi v. DeGrassi, 533 S.W.2d
81, 85 (Tex.Civ.App. - Amarillo 1976, writ ref’d n.r.e.); Bradshaw v. Naumann, 528 S.W.2d 869,
871 (Tex.Civ.App. - Austin 1975, writ dism’d). The party claiming undue influence must establish
that the instrument in question is the product of undue influence and that the influence existed at the
very time the instrument was executed. Rothermel v. Duncan, supra at 922.
            Undue influence may be shown by direct or circumstantial evidence but will usually be
established by the latter. Estate of Davis v. Cook, 9 S.W.3d 288, 293 (Tex.App. - San Antonio 1999,
no pet’n). When circumstantial evidence is relied upon, the circumstances must be so strong and
convincing and of such probative force as to lead a well-guarded mind to a reasonable conclusion
not only that undue influence was exercised but also that it controlled the willpower of the testator
at the precise time the will was executed. Estate of Davis v. Cook, supra. Circumstances relied on
as establishing the elements of undue influence must be of a reasonably satisfactory and convincing
character, and they must not be equally consistent with the absence of the exercise of such influence. 
 Estate of Davis v. Cook, supra. 
            Factors to be considered in determining the existence of undue influence include the
following: (1) the nature and type of relationship existing between the testator, the contestants, and
the party accused of exerting such influence; (2) the opportunities existing for the exertion of the
type or deception possessed or employed; (3) the circumstances surrounding the drafting and
execution of the testament; (4) the existence of a fraudulent motive; (5) whether there had been a
habitual subjection of the testator to the control of another; (6) the state of the testator’s mind at the
time of the execution of the testament; (7) the testator’s mental or physical incapacity to resist or the
susceptibility of the testator’s mind to the type and extent of the influence exerted; (8) words and acts
of the testator; (9) weakness of mind and body of the testator, whether produced by infirmities of age
or by disease or otherwise; and (10) whether the testament executed is unnatural in its terms of
disposition of property. In re Estate of Graham, 69 S.W.3d 598, 609-10 (Tex.App. - Corpus Christi
2001, no pet’n).
            We consider the evidence in light of the above factors and the standards of review in
determining whether the record contains legally and factually sufficient evidence to support the
jury’s undue influence findings. The jury was free to believe Barbara’s and Nancy’s testimony and
to disbelieve Joyce’s testimony. McGalliard v. Kuhlmann, supra at 697. Thus, the jury could have
concluded that Bill was susceptible to undue influence. Barbara and Nancy offered evidence (1) that
Bill had suffered hallucinations before 1995; (2) that Bill’s physical and mental condition
deteriorated substantially from 1995 until he died; (3) that Bill did not recognize them at times
before he signed the will in question; and (4) that the doctors at the hospital suspected that Bill had
long-term dementia. Joyce had the opportunity to exert undue influence over Bill. Joyce stayed with
Bill within two or three months after Lizzie B. died. They were married and lived together on a daily
basis before Bill executed any of the documents in question.
            Barbara and Nancy also presented evidence that Joyce controlled their father. Barbara
testified that Joyce screamed at Bill when he was confused. Joyce never left Bill alone with Barbara
or Nancy. Joyce was present whenever Barbara and Nancy were with their father. Joyce controlled
the conversations; she did all of the talking while Bill just sat there. The evidence showed that Bill
did whatever Joyce asked him to do. He “hopped up like a puppet” when Joyce said that they needed
to go somewhere. The evidence established a pattern of control throughout the years. When Bill
fell and broke his hip, Joyce did not even let his family know that he was in the hospital. Joyce
controlled the decisions at the hospital, including the decisions to refuse treatments and medications.
The evidence showed that Bill was habitually subjected to Joyce’s will. Based on the evidence, the
jury could have rationally concluded that Joyce isolated Bill from Barbara and Nancy so that she
could impose her will on him. 
            Joyce participated in the preparation of the will and the warranty deeds. She called Donk to
schedule the meetings. Joyce was present at all times during the meetings about the will. Bill was
never alone with Donk. Joyce was with Bill when he signed the will. She was present during the
discussions about Bill’s children being unfair to her and about a possible will contest. The evidence
supports a conclusion that Joyce led Bill to believe that his children were being unfair to her and that
they were going to challenge the will. 
            Bill left everything to Joyce in his will. Based on the evidence, Bill’s will provided for an
unnatural disposition of his property. Bill had loving relationships with Barbara and Nancy before
Joyce’s arrival. If the jury believed Barbara’s and Nancy’s testimony – which the jury was free to
do – Barbara and Nancy did not cause the change in their relationships with their father after Joyce
became involved with him. Based on the evidence, the jury could have concluded that Joyce was
keeping them away from their father and that Joyce was attempting to destroy their relationships with
their father. The jury obviously believed that Bill’s dementia made him susceptible to Joyce’s
influence. Barbara and Nancy offered testimony of their father’s intent to leave his property,
including the CDs, to them. Bill referred to the CDs as his children’s “nest egg.” The evidence
included statements that Bill intended for the CDs to go to his children. Bill’s execution of the will
and other documents in this case is contrary to his intent to leave property to his children. Based on
the evidence, the jury could have concluded that Bill would not have executed the will and the other
documents but for Joyce’s influence. 
            We find that the evidence was legally and factually sufficient to support findings: (1) that
Joyce exerted an influence over Bill; (2) that the influence subverted or overpowered Bill’s mind
when he executed the documents; and (3) that Bill would not have executed the documents but for
the influence. Therefore, the evidence was legally and factually sufficient to support the jury’s undue
influence findings. Joyce’s appellate issues are overruled. 
This Court’s Ruling
            The judgment of the trial court is affirmed. 
  
                                                                                                TERRY McCALL
                                                                                                JUSTICE
 
August 25, 2005
Not designated for publication. See TEX.R.APP.P. 47.2(a).
Panel consists of: Wright, J., and McCall, J.