**Opinion filed April 30, 2015**



In The

# Eleventh Court of Appeals

_____

## No. 11-13-00113-CV

_____

## IN THE MATTER OF THE
## ESTATE OF BUSTER E. HANSON, DECEASED

**On Appeal from the 220th District Court**
**Comanche County, Texas**
**Trial Court Cause No. CV01412**

### M E M O R A N D U M   O P I N I O N

Shortly before his death, Buster E. Hanson executed a Last Will and Testament (2011 Will) that revoked his prior will. After his death, a will contest ensued when his daughter, Suzanna La Vonia Hanson, offered the 2011 Will for probate. The 2011 Will left her father's entire estate to her, whereas the prior will, executed in 2008, had left the majority of the estate to her brother, Malcolm Hanson. The jury found that Suzanna had unduly influenced her father to change his will and that she had failed to offer the 2011 Will for probate in good faith and with just

cause. She argues, in four issues, that the evidence was legally and factually insufficient to support the findings of the jury. We affirm.

## I. *Evidence at Trial*

Buster and LaRue Hanson were married in 1958. They had four children together, but only two adult children, Malcom and Suzanna, survived them.[1] LaRue died in February of 2011, approximately ten and one-half months before Buster, who died on December 24, 2011, at the age of eighty-eight. Buster and LaRue's largest assets were the two-hundred-acre pecan farm where they resided and mineral interests located on other property.

### A. *Buster's and LaRue's Wills*

Buster and LaRue each executed three wills in the latter parts of their lives. Each of their first wills left the other a life estate in his or her respective interest in the farm, with the remainder left to Malcolm. Each of their second wills left the other his or her respective interest in the farm in fee simple, but provided that Malcolm would take the farm in fee simple after the death of the second of the two. LaRue's third will, which was similar to her first will, left Buster a life estate in her interest in the farm, with a remainder left to Malcolm in fee simple.[2] Buster's final will changed his prior wills and left his interest in the farm to Suzanna in fee simple. Each of LaRue's and Buster's wills either did not address the minerals or devised them so that eventually Malcom and Suzanna would share equally.

---

[1]Buster also had a child from a previous marriage, Diane Hanson Parma. Buster and Parma were not close. Her interest in all of Buster's wills was relatively marginal, and she is not involved in this litigation.

[2]Buster was unaware Larue had executed this will until after her death. LaRue left Buster a love letter that explained why she changed her will without telling him. The letter indicated that LaRue left Buster only a life estate in the farm because she wanted to ensure that Buster and their kids always had a place to live and did not want Buster to be able to sell the farm.

## B. *Buster's Last Will*

Malcolm testified he lived on the farm his entire life, worked the pecan crop on the farm, and was closer to Buster than Suzanna was except for the eight months before Buster's death. Suzanna testified she was close to their father, while Malcolm was closer to their mother. She said their father was hurt when he learned that LaRue had changed her will and had not told him. After Buster learned of LaRue's last will, Buster wanted Suzanna to take him to see a lawyer. Suzanna said Buster wanted to ask the lawyer about removing Malcolm's name from his checking account. At the meeting, Buster asked questions about LaRue's will and about potentially changing his will, though Suzanna claims the main purpose of the meeting was to ask about the checking account. Suzanna conceded she wrote down several things that she claimed Buster wanted to discuss with the lawyer, and she brought those up in the first meeting.

Suzanna called the lawyer a few weeks after the meeting to ask him about drafting her father's will, and the lawyer informed her that he did not feel comfortable writing another will for Buster. The lawyer testified that Suzanna had told him that Buster needed to change his will so it would benefit her, though he could not recall exactly what she said. The lawyer remembered no discussion about Buster's checking account. He also was concerned that Suzanna had undue influence over Buster, so he asked Buster if what Suzanna had said was what he wanted to do; Buster never gave an affirmative answer. The lawyer told Suzanna he needed to hear directly from Buster how to draft the new will. Suzanna and Buster never returned to this lawyer's office, and he did not prepare a new will for Buster.[3]

---

[3]The first lawyer testified that he knew the second lawyer, who had a good reputation. The first lawyer thought his colleague would not have drafted Buster's will if his colleague thought Buster had been unduly influenced.

A short time later, Suzanna drove her father to see another lawyer. Suzanna attended the first meeting between Buster and the second lawyer; she said she wanted to know how to prepare her own will. But she claimed Buster and the second lawyer were alone when the lawyer and Buster discussed the specifics of Buster's will. Suzanna later drove Buster to the second lawyer's office to sign the will, but she remained in the truck while he went inside. She said she and Buster did not talk about the will on the drive to the second lawyer's office. Suzanna claimed that she never pressured her father to change his will or leave her anything and that she never looked at the 2011 Will until after he died.

The second lawyer testified that Buster told him several times he wanted Malcolm and Suzanna to share equally in his and LaRue's property. He also asked Buster several times if anyone persuaded him to change his will; Buster said no one had. The second lawyer acknowledged that Suzanna brought Buster to the appointment to discuss Buster's will, but he said it was normal for a spouse or adult child to do so. He said Suzanna was not in the room when Buster and he discussed the specifics of the will. He said he did not believe Buster was being unduly influenced. He conceded he was unaware of the first lawyer's reticence to draft a new will for Buster.

The second lawyer prepared the 2011 Will and videotaped its execution. During the video, Buster was confused at various times and struggled to identify all his children when asked to do so. When asked if he wanted to continue and sign the will, he responded, "[T]he way I'm seeing it, I don't have much choice and I better do what I said I'd do here. So we'll just go ahead and execute this *deed*, this deal." Suzanna testified that her father was mentally stable and of sound mind when he signed the 2011 Will.

*C. Buster's Physical and Mental Condition*

Dr. Jeffrey Hutchins was Buster's primary physician from 2006 until Buster's death. Dr. Hutchins testified that he observed signs of dementia in Buster soon after LaRue's death but that, prior to November 2011, the dementia was only mild to moderate. Buster's medical records implicitly supported that position. A few days before Buster died, Dr. Hutchins confirmed Buster had dementia. Dr. Hutchins also observed signs of dementia in Buster in the video. In contrast, the second lawyer testified he was sure, after he talked with Buster, that Buster's mind was sound, that he had testamentary capacity, and that his disposition in the will was rational and planned.

Several witnesses testified about their interaction with Buster and his physical and mental decline in the months before his death. The witnesses included Buster's niece, Lisa Weaver; her husband, Jeff Weaver; neighbor, Neil Morris; and good friend, Jim Lampman. Lisa was familiar with the Hanson family; she testified that Suzanna disappeared often and had no contact with her family or her children for months, which worried LaRue and Buster. Lisa said that LaRue and Buster wanted to give the farm to Malcolm because he would take care of Suzanna; LaRue and Buster thought Suzanna would sell the farm and spend the money. Lisa disagreed that Buster was mentally sharp in the last year of his life; she said that Buster was not capable of making important, rational decisions in the fall of 2011. Lisa thought Buster looked like he was under someone's control in the video.

Jeff married Lisa and knew the Hanson family. He testified that Buster and LaRue worried about Suzanna because of her absences and that they had talked openly about leaving the farm to Malcolm, who would keep it in the family; they told Jeff they wanted Malcolm to have the farm because he would tend to it. Jeff noted that Buster had slipped a lot mentally in his last year. He noticed Buster had

trouble remembering things in the video. Jeff claimed that Suzanna was manipulative and capable of influencing Buster to change his will.

Morris testified that he saw Buster most days and became closer to Buster in the last decade of Buster's life. Morris and Buster knew each other for more than fifty years. He noticed Buster's health noticeably declined in the final year of Buster's life; he explained one incident where Buster forgot to wear his shoes in cold weather and another incident where Buster accidently drove his pickup truck into something in the parking lot of the cafe. He did not believe that Buster was mentally sharp and said that Buster should not have made important decisions by himself.[4] Jim Lampman, another friend of Buster, knew him through work and was a friend for almost forty years. He said that Buster was a sharp guy but had slowed down considerably in the final eighteen months of his life. He did not believe that Buster was as mentally sharp as he had been and said that Buster needed help with important decisions. Buster briefly mentioned to Lampman that LaRue left her interest in the farm to Malcolm, and Lampman told Buster he thought that made sense because Buster was getting older and Malcolm took care of the farm.

Other witnesses—Tommy Gibson, Tommy Frost, Jean Stokes, and Lee Gilder—testified that Buster was sharp and knew what he wanted to do with his will. Gibson hunted squirrels on the farm for many years. During each hunting trip, he visited with Buster; he camped at the farm and talked to Buster twice after Buster signed the 2011 Will. Gibson said that Buster had mentioned that LaRue changed her will without telling him and that Buster was going to "straighten that out . . . and will mine to Suzie." But Buster also told Gibson, after Buster modified his will, that

---

[4]Morris also said that Suzanna was not around much and came back to spend time with the family only around the time LaRue died. Morris testified that Malcolm worked hard on the farm and helped Buster a lot.

6

"I'm not certain I solved the problem . . . I think the kids will end up in court over it." Gibson testified that Buster, although in poor physical shape, was still mentally sharp and knew of his surroundings.

Frost met Buster in 1939 and drank coffee with him almost daily for about fourteen years until Buster died. He commented that Buster was mentally sharp and knew what he was doing. When Frost and Buster were at the horse races in Ruidoso, Buster told him that "he wrote it [the 2011 Will] like he wanted it." Frost had no reason to believe that anyone coerced Buster to change his will. Frost had heard about the incident where Buster had not worn shoes on a freezing cold day and of the incident where Buster had accidentally hit the gas pedal instead of the brake pedal and drove his pickup into something in the parking lot of the cafe.

Stokes testified her family and Buster's family were very close and did everything together. According to Stokes, Buster was in good mental condition, and there was no indication that anyone unduly influenced Buster. Buster was upset when he learned LaRue had changed her will; he wanted to make a new will. Stokes heard Buster say, "I want it [the property] to be split right half down the middle. I want to be fair with both of my children."

Gilder also was good friends with Buster and owned property across the road from Buster's farm. After Buster signed his will at the second lawyer's office, he and Suzanna headed straight for Ruidoso, to watch the horse races with Gilder in his box seats at the track. Gilder said that Buster was mentally sharp at the track and that Buster told him he had recently executed a new will, though Buster mentioned no specifics. Gilder also knew Suzanna, but he said, "I don't know [if] you can say I know her well." He admitted that he had loaned her $3,000 to probate the will and that, in 2008, he had offered to buy Buster's farm for $750,000, which was

substantially less than its value at the time of Buster's death. Buster had declined the offer, and Gilder claimed he was no longer interested in the property.

*D. Will Contest*

Suzanna kept Buster's 2011 Will from everyone and offered it for probate upon his death. Under the 2011 Will, Suzanna inherited her father's interest in the farm in fee simple, the money in his bank accounts, all his personal property, vehicles, farm equipment, and one half of his mineral interests, with the other half of the mineral interests going to Malcolm. She testified that she did not make her dad sign the 2011 Will or ask him to leave her anything. Suzanna planned to sell the farm; she admitted that Gilder had made an offer on the farm to Buster and that Gilder had loaned her money to probate the 2011 Will. She denied Gilder had asked about purchasing the farm when he made the loan.

Malcolm brought a will contest and alleged that Buster executed the 2011 Will without testamentary capacity and as a result of undue influence. Malcolm asserted Suzanna had unduly influenced their father to change his will. Malcolm said that neither Suzanna nor his father ever mentioned to him anything about seeing an attorney to change Buster's will. One day, in the summer of 2011, Malcolm walked into the farmhouse and saw Suzanna yelling at their father and waving LaRue's will at him, and when Malcolm came into the room, Suzanna left the room. He also overheard Suzanna tell someone on the telephone that "everything out here is mine" in reference to their parents' and Malcolm's property. Malcolm heard Suzanna tell Buster that Malcolm was staying out all night long and drinking; things Malcolm claimed were untrue and fabricated by Suzanna.

Malcolm explained that his mother left him the farm in fee simple and left his father only a life estate because she was afraid that Suzanna or someone else would take advantage of Buster's old age and persuade him to sell the farm. Unlike

8

Suzanna, Malcolm had no plans to sell the farm; he wanted to keep it in the family. Following Buster's death, Malcolm paid all of the farm's bills, Buster's income tax, and interest due on $27,000 worth of Buster's outstanding notes; he also tended the farm's pecan crop.[5]

Suzanna asserted that her mother was a controlling person and that her mother had threatened her father with divorce if he did not accede to her wishes. According to Suzanna, her mother had unduly influenced her father into signing his prior will, the one offered for probate by Malcolm. Suzanna denied she told their father that Malcolm drank too much. She said Malcolm's drinking was known in the community. The jury found that Buster had testamentary capacity when he executed the 2011 Will but that Suzanna had unduly influenced Buster to execute the 2011 Will; the jury also found that Suzanna had not offered the 2011 Will in good faith and with just cause. The trial court admitted for probate the prior will offered by Malcolm. Suzanna appealed.

## II. *Issues Presented*

Suzanna asserts four issues on appeal. In her first and third issues, she argues that the evidence legally and factually could not support the finding that she unduly influenced Buster to execute the 2011 Will. Suzanna argues in her second and fourth issues that the evidence was legally and factually insufficient to support the finding that she failed to offer the 2011 Will in good faith and with just cause.

## III. *Standard of Review*

When we conduct a legal sufficiency review, we review the evidence in a light that supports the disputed finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001). We "consider all of

---

[5]Suzanna made one $50 contribution toward expenses.

the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor." *In re Estate of Rhea*, 257 S.W.3d 787, 790 (Tex. App.—Fort Worth 2008, no pet.) (citing *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex. 1998)). We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)).

For a factual sufficiency review, we examine all the evidence in the record, both for and against the lower court's findings. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). We consider and weigh all such evidence in a neutral light. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). If the evidence would enable reasonable minds to differ in their conclusions, we do not substitute our judgment, so long as the evidence falls within a zone of reasonable disagreement. *City of Keller*, 168 S.W.3d at 822. In considering and weighing all of the evidence, we will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

## IV. *Analysis*

To establish a claim of undue influence, a contestant must prove the following: (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the person's mind when executing the document; and (3) the person would not have executed the document but for the

influence.  *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963); *Cobb v. Justice*, 954 S.W.2d 162, 165 (Tex. App.—Waco 1997, pet. denied).  The contestant must prove the elements of undue influence by a preponderance of the evidence.  *Cobb*, 954 S.W.2d at 165; *Evans v. May*, 923 S.W.2d 712, 715 (Tex. App.—Houston [1st Dist.] 1996, writ denied).

A finding that an executor procured a will by undue influence does not preclude a finding that the executor, nevertheless, offered the will in good faith and with just cause.  *Harkins v. Crews*, 907 S.W.2d 51, 62 (Tex. App.—San Antonio 1995, writ denied) (citing *Huff v. Huff*, 124 S.W.2d 327, 330 (Tex. 1939)).  Good faith is a question of fact, to be determined under all the circumstances of the case. *Id.*  Good faith and just cause is a separate jury question, and it is not determined automatically by a finding of, or no finding of, undue influence.  *See id.*  We will address the issues on undue influence followed by the issues on good faith and just cause.

A.  *Issues One and Three: Undue Influence*

The rules guiding determination of undue influence apply substantially alike to wills, deeds, and other instruments.  *Rankin v. Rankin*, 151 S.W. 527, 529 (Tex. 1912); *Wils v. Robinson*, 934 S.W.2d 774, 780 (Tex. App.—Houston [14th Dist.] 1996), *writ granted w.r.m.*, 938 S.W.2d 717 (Tex. 1997); *DeGrassi v. DeGrassi*, 533 S.W.2d 81, 85 (Tex. Civ. App.—Amarillo 1976, writ ref'd n.r.e.); *Bradshaw v. Naumann*, 528 S.W.2d 869, 871 (Tex. Civ. App.—Austin 1975, writ dism'd).  The party claiming undue influence must establish that the instrument in question is the product of undue influence and that the influence existed when the instrument was executed.  *Rothermel*, 369 S.W.2d at 922.

Undue influence may be shown by direct or circumstantial evidence but will usually be established by the latter.  *Estate of Davis v. Cook*, 9 S.W.3d 288, 293

(Tex. App.—San Antonio 1999, no pet.).  When circumstantial evidence is relied upon, the circumstances must be so strong and convincing and of such probative force as to lead a well-guarded mind to a reasonable conclusion not only that undue influence was exercised but also that it controlled the willpower of the testator at the precise time the will was executed.  *Id.*  "Circumstances relied on as establishing the elements of undue influence must be of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of the exercise of such influence."  *Id.*

Factors to be considered in determining the existence of undue influence include:

> (1) the nature and type of relationship existing between the testator, the contestants[,] and the party accused of exerting such influence;

> (2) the opportunities existing for the exertion of the type or deception possessed or employed;

> (3) the circumstances surrounding the drafting and execution of the testament;

> (4) the existence of a fraudulent motive;

> (5) whether there has been a habitual subjection of the testator to the control of another;

> (6) the state of the testator's mind at the time of the execution of the testament;

> (7) the testator's mental or physical incapacity to resist or the susceptibility of the testator's mind to the type and extent of the influence exerted;

> (8) words and acts of the testator;

(9) weakness of mind and body of the testator, whether produced by infirmities of age or by disease or otherwise; [and]

(10) whether the testament executed is unnatural in its terms of disposition of property.

*In re Estate of Graham*, 69 S.W.3d 598, 609–10 (Tex. App.—Corpus Christi 2001, no pet.).

### 1. *Legal Sufficiency*

Suzanna asserts there is no evidence to support the verdict of the jury that she unduly influenced her father. If more than a scintilla of evidence supports the challenged finding, her no-evidence challenge must fail. *See Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003); *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999).

### a. *Factors One, Eight, and Ten*

Factors one, eight, and ten involve the nature and relationship of the testator and the contestants, the testator's words and actions, and whether the testator's disposition was unnatural. *See Graham*, 69 S.W.3d at 609–10. Buster and LaRue married and had children together, but only two, Malcolm and Suzanna, survived them. The evidence showed that Suzanna lived away from her parents for a long period of time and that she would disappear for long stretches without contacting her family; Buster and LaRue worried about her. Buster and LaRue wanted the farm to stay in the family so Suzanna would have a place to go whenever she needed it. Buster and LaRue worried that Suzanna, if given the chance, would sell her interest in the farm and waste the money.

LaRue died in February 2011, and Buster died ten and one-half months later at the age of eighty-eight. Buster and LaRue's largest asset was their two-hundred-acre pecan farm. They also had mineral interests located on other property.

Malcolm said LaRue left him her interest in the farm in fee simple and left his father only a life estate because she was afraid that Suzanna or someone else would take advantage of Buster's old age and persuade him to sell the farm too easily. All three of LaRue's wills and the first two of Buster's wills would have accomplished their goal to give the farm to Malcolm and keep it in the family. Buster's final will departed from his previous wills with respect to how he devised his property.

### b. Factors Two, Six, Seven, and Nine

These four factors focus on the testator's state of mind and his physical and mental condition, his ability to resist the influence of Suzanna, and the opportunities Suzanna had for influence. *See Graham*, 69 S.W.3d at 609–10. Buster was eighty-eight years old, and his mental and physical condition declined greatly in 2011. His advanced age contributed to his weakness of mind and body. Dr. Hutchins observed signs of mild to moderate dementia in Buster. Dr. Hutchins said that Buster exhibited signs of dementia in the video.

Suzanna moved back home, for the first time in thirty years, shortly before LaRue's death, and she lived with LaRue and Buster until their deaths; afterward, she continued to live in the home. Malcolm had lived in the residence his whole life, but he moved into a trailer when Suzanna moved back home. One day, Malcolm walked in and saw Suzanna yelling at Buster, waving LaRue's will at him. He also overheard Suzanna say to someone, while she was on the telephone, that "everything out here [the farm] is mine, they'll all be mine [Buster's property], and if he [Malcolm] keeps messing with me, I'll have his [Malcolm's] stuff, too."

Lisa said that LaRue and Buster knew that Malcolm would take care of Suzanna and that LaRue and Buster thought Suzanna would sell the farm and waste the proceeds. Lisa said that Buster was not capable of making important, rational decisions. Both Lisa and Jeff watched the video and noted that Buster was not

14

mentally sharp, like he used to be, and Lisa thought someone was controlling him. Jeff testified that he thought Suzanna was capable of influencing Buster to modify his will.

### c. Factors Three, Four, and Five

These factors look at the circumstances surrounding the drafting and execution of the testament, the existence of a fraudulent motive, and whether the testator had been habitually under the control of another. *See Graham*, 69 S.W.3d at 609–10. After LaRue's death, Malcolm caught Suzanna yelling at Buster about LaRue's will. The first lawyer testified that Suzanna told him how to write Buster's will; when he asked Buster if those were his wishes, Buster was reluctant and never gave an affirmative answer. The lawyer wanted to talk to Buster about Buster's intentions, but Suzanna and Buster never returned to his office. When the lawyer told her he would not draft another will for Buster, Suzanna drove Buster to see another lawyer. Later, Buster signed the 2011 Will drafted by the second lawyer.

Suzanna kept Buster's 2011 Will from everyone and offered it for probate upon his death. Suzanna planned to sell the farm. Suzanna wanted the farm sold; Malcolm did not. Malcolm also overheard Suzanna tell someone that "everything out here is mine." Suzanna conceded that Gilder had made an offer on the farm to Buster, which Buster had rejected, and that Gilder had loaned Suzanna money to probate the 2011 Will. In reviewing all of the evidence we have previously outlined and the ten factors for analyzing whether there was undue influence, we hold that there was some evidence that Suzanna unduly influenced Buster.

### 2. Factual Sufficiency

Suzanna also argues that the finding of the jury that she unduly influenced her father to change his will was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 176. "Jurors are the sole

15

judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another." *City of Keller*, 168 S.W.3d at 819 (footnote omitted).

Gibson, Frost, Stokes, and Gilder all testified that Buster was sharp. Gibson testified that Buster was still mentally sharp and knew of his surroundings. Gibson testified that Buster mentioned to him that LaRue changed her will without telling him and that Buster said he was going to "straighten that out . . . and will mine to Suzie." Frost commented that Buster was mentally sharp and knew what he was doing. Frost said Buster told him, when speaking of his will, that "he wrote it like he wanted it." Frost had no reason to believe that anyone coerced Buster to change his will. Stokes said that Buster was in good mental condition and that Buster said that he wanted the property "to be split right half down the middle. I want to be fair with both of my children." Gilder said that Buster was mentally sharp and that, when they were in Ruidoso, Buster told him he had recently executed a new will.

Other witnesses testified Buster was susceptible to undue influence. Lisa watched the video and testified that Buster was not mentally sharp and that she thought he was being controlled. Jeff also noted that Buster had slipped a lot mentally in his last year. Jeff watched the video and said Buster could not recall things he normally remembered. Morris said Buster should not have made important decisions by himself. Lampman said that Buster was a sharp guy but that he had slowed down considerably and needed help making important decisions.

Several witnesses said Suzanna exerted undue influence over Buster because she had recently moved back home just before LaRue's death and lived with Buster, in his home, until his death. Suzanna drove Buster to the first lawyer's office to get a new will, but that lawyer was concerned that Suzanna had undue influence over Buster; Suzanna then took Buster to another lawyer's office, where the second

lawyer drafted and Buster signed the 2011 Will. Suzanna testified that Buster wanted her to sell her interest in the farm. But Jeff and Lisa testified that Buster and LaRue decided to let Malcolm have the farm. Suzanna claimed she never pressured her father to change his will, but she kept it secret until he died.

The second lawyer did not believe that Buster was being unduly influenced. He conceded he was unaware of the first lawyer's reluctance to draft a new will for Buster. At the will signing, Buster said, "I don't have much choice and I better do what I said I'd do here." The jury could have concluded that Buster wanted to leave his interest in the farm to Malcolm because he wanted to keep it in the family but that Suzanna's undue influence overwhelmed his intent. The jury was the arbiter of the disputed facts. We hold that there is legally and factually sufficient evidence to support the jury's finding that Suzanna unduly influenced Buster into changing his will to benefit her.

### B. Issues Two and Four: Good Faith and Just Cause

Suzanna asserts in her second and fourth issues that there was legally and factually insufficient evidence for the jury to find that she failed to offer the 2011 Will in good faith and with just cause. Former Section 243 of the Texas Probate Code[6] allows for the payment of a designated executor's or beneficiary's legal expenses when that person defends or prosecutes a will in good faith and with just cause, whether or not that person is successful in doing so. *See* former TEX. PROB. CODE § 243, now TEX. EST. CODE ANN. § 352.052 (West 2014).

---

[6]Section 243 of the Texas Probate Code, which was in effect when this case was filed, was repealed (along with the entire Probate Code) by the legislature, and Section 243 was recodified as Section 352.052 of the Texas Estates Code without any substantive modification. *See* Act of May 26, 2009, 81st Leg., R.S., ch. 680, §§ 1, 10–12, 2009 TEX. GEN. LAWS 1512, 1650, 1731–32 (effective Jan. 1, 2014) (current version at TEX. EST. CODE ANN. § 352.052 (West 2014)).

The jury charge instructed that "'good faith' means an action which is prompted by honesty of intention, or a reasonable belief that the action was probably correct." The jury charge further instructed that "with just cause" means that the action of Suzanna, when she offered the document, must have been based on reasonable grounds and that there must have been a fair and honest cause for doing so. A finding of undue influence does not preclude a finding that the will was offered in good faith and with just cause. *Harkins*, 907 S.W.2d at 62. Good faith is a question of fact to be determined from all the circumstances of the case. *Id.*

Determining whether Suzanna filed her application to probate the 2011 Will in good faith and with just cause was a question for the jury to resolve. *See Ray v. McFarland*, 97 S.W.3d 728, 730 (Tex. App.—Fort Worth 2003, no pet.); *Collins v. Smith*, 53 S.W.3d 832, 843 (Tex. App.—Houston [1st Dist.] 2001, no pet.). In *Collins*, the jury found that the contestants did not act in good faith or with just cause when they contested a 1998 will, which they claimed was not prepared according to the usual standards; the contestants filed for probate a will from 1994. *Collins*, 53 S.W.3d at 842–43. The jury heard conflicting testimony about the testator's depression and its effect on his susceptibility to the influence of others, but the jury also heard testimony that he was of sound mind when he executed the will and that the will reflected his wish that his grandchildren inherit his property. *Id.* The *Collins* court held that it was the jury's province to resolve conflicting testimony, and it affirmed the finding of the jury that the contestants had not acted in good faith or with just cause. *Id.*

In *Ray*, the appellate court reversed the judgment non obstante verdicto of the trial court because there was some evidence to support the jury's finding that the contestant had not acted in good faith and with just cause. *Ray*, 97 S.W.3d at 730. The contestant in *Ray* said to her daughter, the sole beneficiary, when she learned

she was excluded as an heir from the decedent's 1991 will, "Now, you listen to me, sister, and you listen to me good; I'm not through with you yet"; the contestant then hired an attorney, contested the 1991 will, and filed a prior will from 1989 that was written by the contestant. *Id.* But the evidence showed the contestant had taken money and other property from the decedent, which is why the 1991 will excluded the contestant as an heir. *Id.*

In the case before us, the first lawyer testified that, during his meeting with Suzanna and Buster, Suzanna told him to write a will for Buster that would benefit her and cut out Malcolm. Suzanna had kept the 2011 Will hidden from everyone. Malcolm overheard Suzanna tell another that "everything out here is mine, they'll all be mine, and if he keeps messing with me I'll have his stuff, too" in reference to their parents' and Malcolm's property. Dr. Hutchins testified that Buster suffered from mild to moderate dementia and had signs of dementia in the video. This evidence is some evidence that Suzanna failed to offer the 2011 Will in good faith and with just cause. Furthermore, the jury chose to believe Dr. Hutchins, the first lawyer, Malcolm, and others and, apparently, chose not to believe conflicting testimony from Suzanna and others. The jury weighed the conflicting evidence and resolved the issue of whether Suzanna acted in good faith and with just cause against her. *See Ray*, 97 S.W.3d at 730; *Collins*, 53 S.W.3d at 842–43. In light of the evidence we have previously outlined, we cannot say that the finding of the jury that Suzanna failed to offer the 2011 Will in good faith and with just cause was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

## V. *Conclusion*

We have reviewed the record and hold that the evidence was legally and factually sufficient to show that Suzanna exerted undue influence over her father that

subverted or overpowered his mind when he executed the 2011 Will and that her father would not have executed the 2011 Will but for her undue influence. We also hold that the evidence was legally and factually sufficient to show that Suzanna failed to offer the 2011 Will for probate in good faith and with just cause. We overrule all of Suzanna's issues.

## VI. *This Court's Ruling*

We affirm the judgment of the trial court.


MIKE WILLSON

JUSTICE


April 30, 2015

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.